**Norman F. HECHT et al., Plaintiffs,**

v.

**PRO-FOOTBALL, INC., et al., Defendants.**

**Civ. A. No. 2815-66.**

United States District Court, District of Columbia.

April 16, 1970.

William Joseph H. Smith, Washington, D. C., for plaintiffs.

Bernard I. Nordlinger, Washington, D. C., for defendant Pro-Football, Inc.

James C. McKay, Washington, D. C., for defendant National Football League.

Lyman J. Umstead, Assistant Corporation Counsel, Washington, D. C., for defendant District of Columbia Armory Board.

## OPINION

WILLIAM B. JONES, District Judge.

This action, as asserted by the plaintiffs in their second amended complaint, was brought against the defendants under § 4 of the Clayton Act (15 U.S.C. § 15), to recover treble damages and obtain injunctive relief because of alleged violations by the defendants of §§ 1, 2 and 3 of the Sherman Act (15 U.S.C. §§ 1, 2 and 3). Only the first three claims of plaintiffs' second amended complaint are pertinent to the matter before the Court. Those claims are set forth separately in what plaintiffs have denominated Counts 1, 2 and 3. The plaintiffs and some of the defendants have filed cross motions for partial summary judgments.[1]

The defendants joining in a motion for partial summary judgment are the National Football League, the District of Columbia Armory Board and its individual members and Pro-Football, Inc., hereinafter referred to as "Redskins."[2]

Count 1 of the second amended complaint charges the defendants with entering into a contract in restraint of trade in violation of §§ 1 and 3 of the Sherman Act. Count 2 of the second amended complaint charges the defendant Redskins as being engaged in an attempt to monopolize the business of professional football in the District of Columbia in violation of §§ 2 and 3 of the Sherman Act. Count 3 of the second amended complaint charges the defendants Redskins and the National Football League of having been engaged and now being engaged in an unlawful conspiracy to restrain and monopolize, and of engaging in an attempt to monopolize, and of having monopolized, the business of professional football in the District of Columbia in violation of §§ 1, 2 and 3 of the Sherman Act.

Essentially the charges made by plaintiffs in Counts 1, 2 and 3 of the second amended complaint arise out of a lease agreement made on December 24, 1959, between the District of Columbia Armory Board and the Redskins and particularly paragraph II(e) of that agreement. By that instrument the Armory Board leased to the Redskins for a period of 30 years, beginning with the football season of 1961 and terminating at the conclusion of the football season of 1990, the now named Robert F. Kennedy Stadium for the purpose of exhibiting all Redskins home professional football games. The lease provided that at no time during its term would the stadium be let or rented to any professional football team other than the Redskins. Plaintiffs assert that that restrictive covenant constituted a contract in unreasonable restraint of the business of professional football in the District of Columbia; that it granted the Redskins a monopoly of the business of professional football in the District of Columbia. And plaintiffs further assert that the restrictive covenant resulted from an unlawful combination and conspiracy being engaged in by the Redskins and the National Football League to restrain and monopolize professional football in the District of Columbia.

The undisputed facts disclose that the Redskins is a professional football team and the only football team which en-

---

1. Certain other defendants named in the second amended complaint were either served and thereafter dismissed or have not been served.

2. Pro-Football, Inc. is a corporation which owns and operates in the District of Columbia a professional football team as a member of the National Football League. That team is known as the Washington Redskins.

gages in the exhibiting of professional football games in the District of Columbia. The National Football League is an unincorporated association of professional football teams located in several cities in the United States. The Redskins is a member of the National Football League and it plays football games with other teams which are members of the National Football League. The schedules of such games are made up by the National Football League and certain services, such as game officials, are made available to the participating teams by the National Football League. The Redskins have been engaged in exhibiting professional football in the District of Columbia for a period of more than 25 years.

Plaintiffs Hecht, Kagan and Miller describe themselves as joint venturers who desire to participate in the ownership of a professional football team that would play its games in the District of Columbia. They assert that because of the restrictive covenant in the Redskins lease with the Armory Board they were unable to organize an American Football League team and a Continental Football League team in the District of Columbia. Plaintiff Washington Federals, Inc., is a corporation created for the purpose of organizing and operating in the District of Columbia a professional football team. Plaintiffs Hecht, Kagan and Miller own all of the stock of the Washington Federals, Inc. Plaintiff United States Football League, Inc., is a nonprofit corporation which Hecht, Kagan and Miller helped to form. The Washington Federals, Inc., is allegedly a member of the United States Football League, Inc. Neither the Federals nor any other franchise holder in that League has ever employed coaches and players let alone fielded a team or played a game.

The American Football League, at the time plaintiffs Hecht, Kagan and Miller announced they were interested in organizing a Washington team in that league, was a separate and competing league from and with the National Football League. Since the institution of this action in 1966, the National Football League and American Football League have merged. That merger and its effects are not relevant to the claims asserted in the Counts 1, 2 and 3 of the second amended complaint.

The Continental Football League has been described by Hecht as a minor football League.

Hecht, Kagan and Miller have never owned nor been associated with an organization which owned and operated a professional football team. Nor have they had any experience with professional football. Hecht is the manager and assistant cashier of a branch bank; Kagan is part owner and operator of a retail liquor store; Miller operates a restaurant. At the time of oral argument counsel for the plaintiffs conceded that, other than as promoters who are attempting to organize a professional football team, plaintiffs Hecht, Kagan and Miller had no business or property that could in any way be injured by the alleged violations of the antitrust laws.

Plaintiffs argue that the restrictive covenant in the Redskins' lease is on its face a contract in restraint of trade and commerce. Defendants respond by asserting that the lease being a contract of the Armory Board, a governmental agency, is not within the scope of the Federal antitrust laws.

In E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority et al., 362 F.2d 52 (1 Cir., 1966), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), plaintiff Wiggins sought to recover treble damages and obtain equitable relief on its claim that defendants Port Authority and two corporations had entered into a conspiracy, combination or contract in restraint of trade or commerce in that they attempted to establish a sole and exclusive fixed base operation at Logan Airport in Boston, Massachusetts, and that each of the defendants attempted to monopolize and combined or conspired to monopolize the fixed base operation business, all alleg-

edly in violation of §§ 1 and 2 of the Sherman Act.[3] The contract with the Port Authority gave the defendant corporations the exclusive right to the fixed base operation at Logan Airport. For some years prior to that contract Wiggins and another company conducted fixed base operations as competitors at Logan Airport. Both Wiggins and the competing company, as a result of the Port Authority's contract with the defendant corporations, were no longer permitted to do a fixed base operation business at Logan Airport. The United States District Court for the District of Massachusetts entered a judgment dismissing the action on the ground that the complaint did not state a claim upon which relief could be granted. The Court of Appeals, in affirming the District Court, stated, 362 F.2d at 55:

> In carrying out its responsibilities the Authority decided that it was necessary to have only one fixed base operation at Logan and pursuant to that decision, entered into the lease with Butler-Boston. It is clear that in doing so it was acting as an instrumentality or agency of the state, pursuant to the legislative mandate imposed upon it to operate and manage the airport and establish rules and regulations for its use. Plaintiff's contention that the Authority in operating Logan Airport is engaged in a purely proprietary capacity and is conducting a private business has no merit. Nor does the arrangement with Butler-Boston violate the Sherman Act. What was done here was in the exercise of a valid governmental function. The antitrust laws are aimed at *private* action, not at governmental action.

The court having found that the Port Authority's conduct was lawful further held that it would be "unreasonable restriction on its freedom to hold that the other defendants acted illegally in hav-

ing aided it" in the performance of a governmental function. 362 F.2d 56.

In Sun Valley Disposal Co., Inc. v. Silver State Disposal Co. et al., 420 F.2d 341, (9 Cir., December 17, 1969), a summary judgment for defendants was affirmed. There plaintiff had operated a garbage pick up and disposal service in Clark County, Nevada. In engaging in that business it had been competing with one of the defendants until the latter obtained an exclusive franchise from the Clark County Commission, a governmental body. In holding that the exclusive garbage collection and disposal service contract was not illegal the Ninth Circuit cited E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, *supra*, as holding that "valid municipal action is without the scope of the federal antitrust laws."

The *Wiggins* and *Sun Valley* decisions are consistent with the rulings of the Supreme Court and other courts that valid governmental action is not subject to the Federal antitrust laws. Eastern R. Conf. v. Noerr Motors, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), Alabama Power Co. v. Alabama Electric Cooperative Inc., 394 F.2d 672 (5 Cir., 1968), rehearing denied, 397 F.2d 809 (1968), Woods Exploration & Producing Co., Inc. v. Aluminum Company of America, 284 F. Supp. 582 (S.D.Texas, 1968).

The plaintiffs would distinguish *Wiggins* and *Sun Valley Disposal Co.* by asserting that the agreements in those cases were the result of governmental action while the leasing of the stadium by the Armory Board to the Redskins was in the nature of a business or proprietary act on the part of the Board. Plaintiffs cite District of Columbia v. Green, 96 U.S.App.D.C. 20, 223 F.2d 312

---

3. "A fixed base operation is one that provides facilities, fuel, equipment, supplies and services at an airport which are used by aircraft, crews, passengers and in handling freight connected therewith. It is vital to air transportation." 362 F.2d 53, n. 2.

(1955), as an authority in support of their contention. But that case had to do with the question of governmental immunity from an action for negligence and not with the matter of immunity from the application of the antitrust laws. The history of immunity or want of immunity in tort actions with respect to municipal corporations is to say the least inconsistent and imprecise. It deals with the difference between discretionary and ministerial acts by municipal corporations as well as efforts to distinguish governmental functions exercised solely for the public at large from those for the private benefit of the municipality. Thus it has been held that fire prevention, police and education are governmental functions while activities related to *municipal railways, airports, gas, water and light systems* are proprietary. But there has been no consistency in the decisions of the courts. 54 Harv.L.Rev. 437, 442, 34 Yale L.J. 129, 22 Va.L.Rev. 910, 914–917, Hesse v. Rath et al., 249 N.Y. 436, 164 N.E. 342 (1928), Scibilia v. City of Philadelphia, 279 Pa. 549, 124 A. 273 (1924), City of Cleveland v. Ruple, 130 Ohio St. 465, 200 N.E. 507 (1936).

Nor does District of Columbia v. Green, *supra,* any longer have its original vitality. Its ruling was undercut in Elgin v. District of Columbia, 119 U.S. App.D.C. 116, 337 F.2d 152 (1964). Moreover, in the recent case of Spencer v. General Hospital of the District of Columbia, D.C.Cir., 425 F.2d 479 (November 10, 1969), the Court of Appeals sitting *en banc* provided "a formal interment of the 'governmental-proprietary' test of immunity."

In applying the "one man one vote" principle, the Supreme Court has considered the building and running of hospitals and the establishing of a housing authority as carrying out governmental functions. Avery v. Midland County, 390 U.S. 474, 476–477, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

In City of Cleveland v. Ruple, 130 Ohio St. 465, 200 N.E. 507, the Cleveland municipal stadium and the related city owned structures, including public halls and a parking garage, were held to have been constructed and leased for public purposes. That such purposes attach to the stadium here is evident from a review of the District of Columbia Stadium Act.

The Robert F. Kennedy Stadium was constructed pursuant to an Act of Congress originally enacted in 1957 and subsequently amended in 1958 and again in 1959. § 2–1720 D.C.Code (1967). That statute expressly authorized the Armory Board to construct, maintain and operate the stadium "[i]n order to provide the people of the District of Columbia with a stadium suitable for holding athletic events and other activities and events of a nature requiring such a facility." In order to accomplish that purpose the Secretary of the Interior was authorized to acquire "by gift, purchase, condemnation or otherwise" certain described property and to enter into a contract with the Armory Board for the construction, maintenance and operation of the stadium which contract was to be for a term not exceeding thirty years. § 2–1721 D.C.Code (1967). The Armory Board, in order to carry out the purposes of the Act, was authorized among other things to determine all questions concerning the use of the stadium for the purposes of the Act, to operate or contract for the operation of concessions deemed appropriate for the purpose for which the stadium might be rented or leased, to furnish services to lessees as in the judgment of the Armory Board were necessary or suitable for carrying out the purposes of the Act, and to lease the stadium for any of the purposes of the Act at such rental values and for such periods of time as the Board should determine. It was pursuant to the authority thus vested in the Board that the lease complained of by the plaintiffs was entered into by the Redskins. § 2–1723 D.C.Code (1967).

That lease was executed on December 24, 1959, for a term of thirty years, which term was to commence with the football season of 1961, and to terminate

at the conclusion of the football season of 1990. As the legislative history of the District of Columbia Stadium Act reveals, there would have been no stadium unless a long-term lease could be negotiated by the Armory Board with the Redskins. When the legislation was under consideration by the committees of Congress the then Chairman of the Armory Board asserted that without a long-term Redskin lease the stadium could not be constructed.[4]

The fact that there is a thirty year lease with the Redskins is significant for two reasons. First, the Stadium Act provides that the Secretary of the Interior's contract with the Armory Board for the construction, maintenance and operation of the stadium was to be for a term of not more than thirty years. Thus that contract and the Redskins' lease are for approximately the same thirty years. Second, Congress authorized the Armory Board to provide for the payment of the construction, operation and maintenance of the stadium through the issuance of bonds with the principal payable not later than thirty years from the date of issuance.[5]

■ Thus, the Armory Board was not only authorized to provide the people of the District of Columbia with a suitable stadium but it was obligated to provide for the payment of the construction, operation and maintenance of the stadium through a bond issue. The sinking fund for the payment of the bonds' principal and interest is to be derived from the receipts resulting from the exercise of the Board of its statutory powers, including the leasing of the stadium. Faced with the obligations imposed by

the Act and aware that a long-term lease with the Redskins was necessary if those obligations were to be met and the purposes of the Act accomplished, the Armory Board entered into the complained of lease agreement. Thus, the leasing of the stadium was pursuant to the mandate of the Act and was governmental action. As such it was as much exempt from the antitrust laws as was the exclusive agreement entered into by the Massachusetts Port Authority in its exclusive lease to the Butler-Boston Company and the exclusive franchise contract between the Clark County Commission and Clark Sanitation, Inc.

Since the Armory Board's conduct was lawful the Redskins did not act illegally in entering into the lease.[6] To conclude otherwise "would be an unreasonable restriction" on the Board's freedom. E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52, 56, cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672, 677, rehearing denied, 397 F.2d 809 (1968). No violation of the Act can be made out even where there is a restraint upon trade or monopolization if it resulted from valid governmental action. Eastern R. Conf. v. Noerr Motors, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Notice has been taken of the other contentions of the parties. Some are inappropriate for consideration on motions for summary judgment; others are without merit.

The motion of defendants Armory Board, Pro-Football, Inc. (Redskins) and the National Football League for summary judgment on Counts 1, 2 and 3 of

4. Transcript of Hearings on S. 3736 and H.R. 12162 before the Subcommittee on the Judiciary of the House Committee on the District of Columbia and the Subcommittee on Fiscal Affairs of the Senate Committee on the District of Columbia, 85th Cong., 2d Sess. (P. 88).

5. In the event refunding bonds were issued they would mature no later than thirty

years from their issuance, or fifty years from September 7, 1957, whichever occurred first.

6. The National Football League contends it had nothing to do with the stadium lease. But assuming it had it, like the Redskins, would not have been acting illegally.

**478**

the second amended complaint is granted.

The motions of plaintiffs on Counts 1, 2 and 3 of the second amended complaint are denied.