Norman F. HECHT, Harry Kagan, Marc A. Miller, Appellants,

Washington Federals, Inc., et al.

v.

PRO–FOOTBALL, INC., et al.

No. 24446.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1971.

Decided April 27, 1971.

Mr. William Joseph H. Smith, Washington, D. C., for appellants.

Mr. Bernard I. Nordlinger, Washington, D. C., with whom Mr. Robert B. Frank, Washington, D. C., was on the brief, for appellee Pro-Football, Inc.

Mr. Ted D. Kuemmerling, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Hubert B. Pair, Acting Corporation Counsel at the time the brief was filed, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee D. C. Armory Board.

Mr. James C. McKay, Washington, D. C., with whom Messrs. Hamilton

Carouthers and Paul J. Tagliabue, Washington, D. C., were on the brief, for appellee National Football League.

Before WILKEY, Circuit Judge, VAN PELT,* Senior United States District Judge for the District of Nebraska, and GIGNOUX,** United States District Judge for the District of Maine.

WILKEY, Circuit Judge.

Appellants brought this action under §§ 1, 2, and 3 of the Sherman Act, alleging that a restrictive covenant in the lease between appellee Pro-Football, Inc., and appellee District of Columbia Armory Board, which prohibits the use of Robert F. Kennedy Stadium by any professional football team other than the Washington Redskins for a period of thirty years, violates the prohibition against contracts in restraint of trade.

Appellant-plaintiffs are three local businessmen, who over a period of time sought to obtain either an American or Continental Football League franchise for Washington, D. C. The appellee-defendants are Pro-Football, Inc., the corporate name of the Washington Redskins, the National Football League, an unincorporated association of owners of professional football teams of which appellee Pro-Football, Inc., is a member, and the District of Columbia Armory Board, an unincorporated instrumentality of the District of Columbia which operates Robert F. Kennedy Stadium.

Count 1 of appellants' complaint alleges that the restrictive covenant in the Redskins' lease on Kennedy Stadium constitutes a contract in restraint of the business of professional football in the District of Columbia, thus violating §§ 1 and 3 of the Sherman Act. Count 2 alleges that the Redskins are engaged in an attempt to monopolize and have monopolized the business of professional football in violation of §§ 2 and 3. Count 3 joins the National Football League and two individuals not parties to this appeal with the Redskins in an alleged unlawful combination and conspiracy to restrain and monopolize the business of professional football in violation of §§ 1, 2, and 3 of the Sherman Act.

On cross-motions for summary judgment, the U. S. District Judge, 312 F. Supp. 472, granted the appellee-defendants' motions for summary judgment on all three counts, reasoning:

> Thus, the leasing of the stadium was pursuant to the mandate of the Act and was governmental action. As such it was * * * exempt from the antitrust laws * * *. No violation of the Act can be made out even where there is a restraint upon trade or monopolization if it resulted from valid governmental action. Eastern R. Conf. v. Noerr Motors, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

In the manner the cross-motions for summary judgment were submitted to the District Court, this was the only issue before it. The District Judge did not purport to decide, and indicated that before doing so he would need to hear evidence, whether the restrictive covenant in the lease *does* constitute a contract in restraint of the business of professional football, or whether this restrictive covenant effectuates any monopoly of professional football by the Redskins, or whether the restrictive covenant furthers the conspiracy to restrain and monopolize the business of professional football as alleged.

Nor do we decide these issues on this appeal. For reasons set forth below, we conclude that the District Judge erred in his holding recited above, and that the cause must be remanded for trial upon the issues left undecided by the grant of appellee-defendants' motion for summary judgment.

### I. *The Statute and the Lease*

The Robert F. Kennedy Stadium was constructed pursuant to an Act of Con-

---

* Sitting by designation pursuant to 28 U. S.C. § 294(d) (1964).

** Sitting by designation pursuant to 28 U. S.C. § 292(c) (1964).

gress of 1957, with amendments in 1958 and 1959.[1] By this statute the Armory Board was authorized to construct, maintain and operate the stadium "in order to provide the people of the District of Columbia with a stadium suitable for holding athletic events and other activities and events of a nature requiring such a facility."[2] The Secretary of the Interior was authorized to acquire "by gift, purchase, condemnation, or otherwise," the property and to contract with the Armory Board for the construction, maintenance and operation of the stadium for a term not exceeding thirty years.[3] Another section of the statute, strongly relied upon by the appellees here, provided:

In order to carry out the purposes of this subchapter, the Board is hereby authorized *without regard to any other provision of law,* but subject to any contract entered into with the Secretary of the Interior under section 2–1721 [for the use of the Stadium site]—

(1) *to determine all questions concerning the use of the stadium* for the purposes of this subchapter;

\* \* \* \* \* \*

(8) *to rent or lease* from time to time for any of the purposes of this sub-chapter, *all or any part or parts of the stadium* including any or all structures, equipment or facilities of the stadium, at such rental values and for *such periods of time as the Board shall determine;* \* \* \*.[4] (Emphasis supplied by appellees in brief.)

Pursuant to this statute the stadium was constructed and the lease between the Armory Board and the Redskins entered into 24 December 1959 for a term of thirty years, commencing with the football season in 1961. There is no contention made here that there was any fraud, misrepresentation, or overreaching on either side. There was arm's-length, hard bargaining between the two parties for approximately a year and a half before the lease agreement was signed. The restrictive covenant complained of reads:

[T]he Lessor shall have the right to lease or otherwise permit the use and occupancy of the Stadium during any period exclusive of such specific dates referred to herein for any purpose or purposes, (except provided in subsection (a) of this Paragraph IX), including (but not limited to) school, college or other amateur or professional baseball, football and basketball games and, also, for such other use or purpose as the Lessor may determine, *provided that at no time during the term of this Lease Agreement shall the Stadium be let or rented to any professional football team other than the Washington Redskins.* (Emphasis supplied.)

It is alleged and not contradicted that Kennedy Stadium is in fact the only suitable place for professional football in the District of Columbia. It is undisputed that it has many unique advantages. In 1965, appellants on behalf of themselves and others with a financial interest in their venture submitted an offer to the Armory Board to lease Kennedy Stadium on those Sundays, Friday nights, and Saturdays, and other times the stadium was not being used by the Redskins, for a minimum guaranteed rent or the same percentage of the gross receipts paid by the Redskins. The Armory Board replied that under the terms of the lease with the Redskins it was prohibited from leasing the stadium to them or to anyone for the use of another professional football team. After reiterations of the offer, the Armory Board continued to adhere to its position that the restrictive covenant of the lease prohibited it from leasing Kennedy Stadium to another football team with-

1. 2 D.C.Code § 1720 *et seq.*

2. 2 D.C.Code § 1720.

3. 2 D.C.Code § 1721.

4. 2 D.C.Code § 1723.

out the consent of the Redskins.[5] Thus, appellants were not able to secure the use of the stadium at any time during the year for professional football purposes, and they allege that for this reason their efforts to obtain franchises in the two professional football leagues fell through.

The District Court emphasized in its opinion that the legislative history of the Stadium Act shows that "there would have been no stadium unless a long-term lease could be negotiated by the Armory Board with the Redskins." The District Court also placed great emphasis on the fact that the Secretary of Interior's contract with the Armory Board for the construction, maintenance, and operation of the stadium was for a term of not more than thirty years, and that Congress authorized the Armory Board to issue bonds for the construction of the stadium with the principal payable not later than thirty years from the date of issuance.

In the District Court's opinion all of this added up to governmental action which created an immunity from the normal application of the antitrust laws. We can agree that most of this was governmental action, that governmental action was sensibly intermeshed and coordinated over the same time span, and that there might have been no stadium unless there could have been a long-term lease with the Redskins professional football team (as well as the Washington professional baseball team), but there is no finding by the District Court that there would have been no lease with the Redskins without the restrictive covenant complained of and that Congress knew this, nor is there any finding that Congress directly authorized such a restrictive covenant.

**II.** *The Applicability of the United States Antitrust Laws to "Valid Governmental Action"*

The rationale of the trial court and the theory of the appellees in sustaining its decision set forth as "the execution of the * * * lease * * * constituted valid governmental action which is immune from application of the antitrust laws." In support of this appellees state, "The key, undisputed fact is that the Armory Board is a governmental agency." And we are cautioned not to "overlook the fact that, in leasing the Stadium, the Armory Board acted pursuant to an Act of Congress." In conclusion, after review of the pertinent authorities, appellees deduce the "rule that where direct governmental action, as distinct from private conduct, has caused the alleged injury to a plaintiff, the provisions of the federal antitrust laws are inapplicable, * * * " and "the action of the Armory Board in entering into the Stadium lease with the Redskins was a governmental act which is immune from application of the antitrust laws."

After a study of the rationale back of the decided cases in this area of antitrust law, we consider that the issue, the facts considered most relevant by appellees, and the rule derived by appellees is a much too talismanic approach where scrupulous distinctions are called for. As was said earlier this year by Judge Goldberg in Woods Exploration & Producing Co., Inc. v. Aluminum Co. of America, "[t]he instant case involve[s] state participation. That proposition, however, only begins the analysis, for it is not every governmental act that points a path to an antitrust shelter. We reject 'the facile conclusion that action by any public official automatically confers exemption.' George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., * * * 1 Cir. 1970, 424 F.2d 25, 30."[6] Like

5. On 7 October 1965 the Special Assistant to the Solicitor of the Department of Interior furnished the Solicitor's legal opinion to the Armory Board, concluding that the restrictive covenant in the lease was in violation of the antitrust laws. On the basis of a contrary opinion from

a private law firm, however, the Board adhered to its position that the lease's restrictive clause was binding and enforceable.

6. 438 F.2d 1286 (5th Cir., 5 Jan. 1971). Though *Woods* never referred to Ala-

Circuit Judge Coffin in *Paddock Pool*, *supra*, "[w]e are particularly reluctant to rely on verbal formulae to solve problems of antitrust liability." [7]

Although the Sherman Act has been characterized as "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," [8] it is fundamental that neither the Sherman Act nor any other antitrust statute restricts the United States Government in directing action in complete contradiction to antitrust policy, because after all the Sherman Act and related antitrust statutes are only statutes, not constitutional charters. But, the basic philosophy of our antitrust policy has been so long established, is of such recognized economic importance, and has assumed in the statutory scheme of things such high dignity [9] that a contrary congressional intent or "immunity from antitrust laws 'is not lightly implied.' " [10]

Anticipating a bit our conclusions below, we suggest that it may be inaccurate and confusing to speak of "valid governmental action which is immune from application of the antitrust laws."

Rather, the proper inquiry would seem to be to what extent Congress has knowingly adopted a policy contrary to or inconsistent with the previously established antitrust laws, or, where state action is concerned (since states are not named in the Sherman Act and antitrust laws are directed at suppression of anticompetitive business action), the inquiry should be to what extent is the state action permissible as not contravening the federal antitrust laws, which in our federal system constitute overriding legislation under the federal commerce power.

Putting the problem in this light, relevant criteria would include the specific language of the congressional statute involved, any legislative history which would throw light on the congressional intent, the relative importance of the governmental action which is asserted to override antitrust policy, whether the governmental agency is required to take into consideration the possible anticompetitive effect of its actions, whether the agency is required to adhere to a clearly defined and restricted statutory directive, and to what extent the agency's actions are subject to judicial review.

bama Power Co. v. Alabama Electric Cooperative, 394 F.2d 672 (5th Cir. 1968), it is obvious that its rationale, based as it is on the proposition that "not every governmental act * * * points a path to an antitrust shelter," represents a significant shift in the Fifth Circuit away from the views of the majority in *Alabama Power*, which was based upon the flat assertion that "it is settled that neither the Sherman Act nor the Clayton Act was intended to authorize restraint of governmental action," *id.*, at 675, towards the rationale of Judge Godbold's dissent in that case. In language expressive of the approach we take here, Judge Godbold stated:

Congress can, and in numerous instances by express legislation has, subordinated the national policies reflected in the antitrust laws so as to authorize government officials to perform acts or pursue policies without regard to the antitrust laws. * * * The courts carefully have limited these expressly conferred immunities to the scope defined in each instance by Congress so as to avoid pro tanto repeal

of the antitrust laws. *Id.*, at 680. And,

The cases do not support a proposition of general governmental immunity. If there is such a principle Congress has been proceeding for a long time under a misapprehension in providing for government officers, and those with whom they deal, exemptions which are specific in nature and varying in scope. *Id.*, at 685.

7. 424 F.2d 25, 29 (1st Cir. 1970).

8. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

9. *See, e. g.*, United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963), stressing "the felt indispensable role of antitrust policy in the maintenance of a free economy."

10. United States v. First City National Bank, 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967), quoting California v. F.P.C., 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).

We now turn to examine previous cases in which so-called governmental action immunity has been an issue, the answers given therein, and the principles which emerge therefrom.

## A. *State regulation of business.*

Although it might be more logical to consider first the Federal Government's regulation of business, yet the cases relied upon most strongly by both parties involved state action raising questions under the federal antitrust laws, and since the Armory Board here is somewhat similar to a state governmental agency, we turn first to the state regulation cases.

The oldest called to our attention is Olsen v. Smith,[11] in which Texas harbor pilots, licensed by the State of Texas, sued to enjoin the activities of non-licensed pilots. The defendants challenged the state licensing system as being invalid under the federal antitrust laws, an argument which the Supreme Court rejected:

> [I]f the state has the power to regulate, and in so doing to appoint and commission those who are to perform pilotage services, it must follow that no monopoly or combination in a legal sense can arise from the fact that the duly authorized agents of the state are alone allowed to perform the duties devolving upon them by law.[12]

Parker v. Brown[13] is apparently the decision which opened the eyes of the antitrust bar to the possibilities of avoiding the impact of the antitrust laws, if only state governmental action is in some way involved. In *Parker* the State of California, at the petition of some raisin growers, established market and price controls over California raisins, an action which necessarily had considerable impact on competition, since California produces most of the raisins consumed in the United States. The Supreme Court validated this marketing program, adopted pursuant to the California Agricultural Prorate Act, holding that the Sherman Act prohibits private action which has an anticompetitive effect, but does not apply to state action. The Court "found the California regulation consistent with the national policy embodied in the Agricultural Adjustment Act, which authorized the Secretary of Agriculture to impose similar marketing restrictions and which recognized the simultaneous coexistence of state regulation in its general instructions to the Secretary of Agriculture to harmonize state and federal regulation."[14]

Since the Court found the state regulation harmonious with the federal agricultural regulatory scheme, the Supreme Court could safely find that Congress had no intent to have the already existing antitrust laws forbid this type of state action, *i. e.*, state agricultural regulation. The Congress had already enacted a federal Agricultural Adjustment Act, which was inconsistent with the application of the previously existing federal antitrust laws in this area, the congressional agricultural statute was of equal dignity with the antitrust statute, and the state agricultural action was harmonious with the federal regulation; hence, the Supreme Court did not apply the prohibitions of the antitrust laws to this type state regulatory action.

In so doing, however, the Supreme Court did not give much emphasis to a comparative evaluation of the other important national policy, and used broad language which was to provide the foundation for a much more expansive governmental action immunity doctrine to be developed by other courts in later cases:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to re-

---

11. 195 U.S. 332, 25 S.Ct. 52, 49 L.Ed. 224 (1904).

12. *Id.*, at 345, 25 S.Ct. 52, 55.

13. 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

14. P. Areeda, Antitrust Analysis 57 (1967).

strain a state or its officers or agents from activities directed by its legislature. * * * [A]n unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.[15]

The Court also pointed out:

The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.[16]

Thus, Parker v. Brown involves not just state governmental action; it involves regulatory action in the state's capacity as sovereign, and it involves sovereign state regulatory action which is consistent with federal national policy, i. e., the Agricultural Adjustment Act, enunciated by the national Congress, which is also the source of federal antitrust policy.[17]

The valid rationale of Parker v. Brown was recently extensively analyzed by the Fifth Circuit in Woods Exploration & Producing Co., Inc., et al. v. Aluminum Company of America, et al.[18] There two large-tract natural gas operators allegedly conspired to file false forecasts with the Railroad Commission of Texas, which regulates the allowable amount of gas to be produced from each well or unitized tract. These forecasts were used by the Railroad Commission to calculate the production allowable, and thus had a

15. 317 U.S., at 350–351, 63 S.Ct. 307, 313.

16. 317 U.S., at 352, 63 S.Ct. 307, 314.

17. Years later the Fourth Circuit explained some of the limitations inherent in Parker v. Brown:

The teaching of Parker v. Brown is that the antitrust laws are directed against individual and not state action. When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation, provided their activities are adequately supervised by independent state officials. * * * (Citing cases.) * * * But such action must be state action, not individual action masquerading as state action. A state can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful. Ashville Tobacco Board of Trade, Inc. v. F.T.C. (4th Cir. 1959), 263 F.2d 502, 509. Cf. the most recent Fourth Circuit decision following Parker, Washington Gas Light Co. v. Virginia Electric and Power Co., 438 F.2d 248, (4th Cir. 12 Feb. 1971).

See also the recent decision of the Fifth Circuit in Gas Light Co. of Columbus v. Georgia Power Co., 440 F.2d 1135, 1137 (5th Cir., 23 March 1971), where in considering the antitrust implications of the adoption by the Georgia Public Service Commission, regulating industry of undeniable importance to the state, the court said:

Each of these acts and practices are rate schedules and each has been considered by the Georgia Public Service Commission in an adversary proceeding. Each is effective by order of the commission. * * * Defendant's conduct cannot be characterized as individual action when we consider the state's intimate involvement with the rate-making process. Though the rates and practices originated with the regulated utility, Georgia Power, the facts make it plain that they emerged from the commission as the products of the commission. They are thus immune from the operation of the antitrust laws under the Parker exemption.

The result reached differs from that by the same Circuit in Woods, but is justified by the fact that, although a state regulatory agency is involved in each instance, in Woods the action of the agency was alleged to be influenced by the illegal agreement among the private parties to furnish false data, while no such circumstance was alleged in Gas Light. However, the approach of Judge Bell in Gas Light gave more weight to the sheer existence of state action than did the attempt to reconcile antitrust and regulatory policies of Judge Goldberg in Woods or Judge Godbold dissenting in Alabama Power, perhaps because such comparative analysis was simply not called for on the facts of Gas Light.

18. Supra, note 6.

direct influence on the nature of the state regulatory action taken, particularly an adverse influence on the amount of production allowed small-tract natural gas operators, who filed the antitrust suit. The defendants relied upon Parker v. Brown, *supra,* Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,[19] and United Mine Workers v. Pennington.[20] The Fifth Circuit reversed the District Court's grant of summary judgment to the defendants, holding that the Woods case was similar to Continental Ore Company v. Union Carbide and Carbon Corporation,[21] where the Supreme Court held that defendants' anticompetitive activities were not protected under the *Parker* rationale.[22] Judge Goldberg's carefully reasoned opinion also rejected the rationale "that because of extensive regulation the oil and gas industry is not susceptible to the strictures of the antitrust laws." Rather, he considered that "state regulation does not mean that there is no room for antitrust policies to operate. * * * We therefore think it incumbent upon this court to render both state regulatory and federal antitrust goals complementary rather than mutually exclusive."[23]

In *Woods* the Fifth Circuit took the approach of trying to reconcile the overall antitrust policy with the highly important state policy of regulating gas output. Where state regulatory action is concerned, this is a logical approach.

But this reconciliation of state and federal goals is but a part of the overall problem, is only one example of several areas where the overall question is to what extent, if any, the Congress intended to permit action not consistent with the antitrust laws. In the case at bar we do not put the matter as an effort to make state and federal goals complementary rather than exclusive. Since Congress enacted both the antitrust laws and the District of Columbia statute authorizing the construction of the stadium, the proper inquiry is to what extent, if any, Congress intended the action of the Armory Board not to be subject to the previously existing national antitrust policy. The appellees contend, and the trial court seemed to go on this theory, that where there can be established unequivocal state action the antitrust laws do not apply. We might paraphrase Judge Goldberg, "But this state [action] does not mean that there is no room for antitrust policies to operate."[24]

B. *State-created sole instrumentalities.*

In contrast with the technique of regulating a field of business with resulting undeniable anticompetitive effects, in some instances the state has either created or contracted with a corporate entity, which became the state's sole instrumentality in carrying out what clearly would otherwise be a governmental function.

19. 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed. 2d 464 (1961).

20. 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965).

21. 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962).

22. The *Woods* opinion describes *Continental Ore* thusly:
There, a private firm acting as administrator of Canada's wartime rationing program used its discretionary power to exclude a competing processor of vanadium ore from the Canadian market. In defense of a private treble damage action, defendants asserted that the purchasing agent was acting as an administrator of the Canadian Government and that the conduct was therefore privileged under *Parker.* The Supreme Court, stressing that there was no evidence that the Canadian Government had approved of the conduct of its agent, held that such conduct was subject to the Sherman Act. Again, in *UMW v. Pennington* * * the Court reiterated this rationale and distinguished *Continental Ore* on the ground that in that case there had been no indication that any Canadian official "would have approved of joint efforts to monopolize the production and sale of vanadium * * *." 438 F.2d at 1295–1296.

23. *Supra,* note 6, at 934.

24. *Id.*

In E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,[25] "[t]he Authority decided that it was necessary to have only one fixed base operation at Logan [Airport] and pursuant to that decision, entered into the lease with Butler-Boston. It is clear that in doing so it was acting as an instrumentality or agency of the state, pursuant to the legislative mandate imposed upon it to operate and manage the airport and establish rules and regulations for its use." The action of the Authority in entering into the exclusive lease with Butler-Boston for the base operation at Logan Airport necessarily had an anti-competitive effect upon all other private corporations, including the plaintiff Wiggins Airways, who might have been involved in, or who might have desired to enter into, all or part of the activities constituting the operation of the base at Logan Airport. Wiggins sued under §§ 1 and 2 of the Sherman Act, alleging the exclusive lease contract was violative of these sections. Here obviously was a situation in which the state itself might have performed the very functions that it delegated to Butler-Boston as its exclusive instrumentality; hence, the First Circuit rejected the plaintiff's contention that the state action was violative of the federal antitrust laws.

A similar rationale lies behind the decision in Ladue Local Lines, Inc. v. The Bi-State Developmental Agency of the Missouri-Illinois Metropolitan District.[26] There Ladue, a private corporation engaged in bus transport in the metropolitan St. Louis area, alleged violation of § 2 of the Sherman Act in the organization of Bi-State through legislative action by Missouri and Illinois, and the subsequent action of Bi-State in the transportation of school children in the metropolitan area of St. Louis. The Eighth Circuit held:

> The fact that the effect of the compact gives Bi-State a monopoly and that competitive interests of private con-

cerns are harmed does not violate the Sherman Act. We deem it well settled that when a state announces a public policy against free competition in an industry essential to it, state control and regulation of that industry, even to the extent of eliminating competition, is permissible.[27]

Here again the operation of a municipal bus line is something which the state or its creature, a municipality, might do for itself. Since an area in two states was involved, the legislatures of two states, with the approval of the United States Congress, created a bi-state authority to perform a strictly governmental function which, if performed by government, would certainly constitute a monopoly. The fact that the two states chose to create a separate public service non-profit corporation to serve as the sole instrumentality does not run afoul of the federal antitrust laws.

We suggest the obvious distinction of *Wiggins Airways* and *Ladue Local Lines* from the case at bar is that when Congress empowered the Armory Board to construct, maintain, and operate Kennedy Stadium, it was empowering the Armory Board to do what another governmental agency, such as the Interior Department, which does own the land and the stadium itself, could have done as straight-forward federal governmental action, *i. e.*, operate the stadium with full authority to rent to exhibitors of football games. On the rationale of *Ladue* and *Wiggins* such governmental agency action would not be subject to antitrust challenge, nor is the Board's management of the stadium *per se* challenged. But what Congress did not do is create the Board as an instrumentality to own and manage the only professional football team to be allowed to play in the stadium; hence, neither the Board nor the Redskins in this case are performing a function that a purely governmental agency itself could have performed. On this basis we consider

25. 362 F.2d 52, 55 (1st Cir. 1966).

26. 433 F.2d 131 (8th Cir. 1970).

27. *Id.*, at 137.

that the rationale justifying holding the federal antitrust laws inapplicable to the state action in *Wiggins* and *Ladue* is not a rationale which supports the position of the appellees here.

#### C. *Joint efforts to secure governmental action.*

Two cases relied on by appellees here have been cited almost as much as Parker v. Brown for the proposition that where state action can be found the application of the antitrust laws cannot.

In an opinion heavy with overtones of First Amendment rights, the Supreme Court in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,[28] legitimatized joint efforts by businessmen to influence legislative or executive action, holding that even actions designed to injure their competitors did not violate the Sherman Act.

> A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.[29]

In United Mine Workers v. Pennington[30] a small mining company brought an antitrust action against larger mining companies and labor unions, alleging a conspiracy in violation of the Sherman Act, one of the objectives being to cause the Secretary of Labor to set unreasonably high wage rates and the ultimate objective being to put the small company out of business. The Supreme Court followed *Noerr* and held that "joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." [31]

First Amendment rights following *Noerr* and *Pennington* were given their most expansive treatment in United States v. Johns Manville Corporation,[32] where it was held that activities engaged in to influence the decisions of public procurement officials on product specifications so narrowly as to eliminate the products of competitors, "are constitutionally protected and cannot be the basis of a finding of violation of the antitrust laws, * * * regardless of the intent with which they were undertaken." [33] The Justice Department did not take an appeal from dismissal of the Johns Manville complaint by the District Court, and thus the rule of *Noerr-Pennington* was expanded to legitimatize combinations to influence the government's actions as a purchaser in the market, not only when acting in a sovereign legislative or regulatory capacity.[34] In the case at bar the government agency, the Armory Board, is not acting as a *purchaser* in the market, but rather as a *seller* of facilities in which football games can be played. If *Johns Manville* were binding precedent, the appellees' reliance on the *Noerr-Pennington* doctrine would be better placed. But even at the time of the *Johns Manville* District Court decision there were

---

28. 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

29. *Id.*, at 139, 81 S.Ct. 523, 530–531.

30. 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965).

31. *Id.*, at 670, 85 S.Ct. 1585, 1593. Without at this moment analyzing what the Congressional Act authorizing Kennedy Stadium does contain in the way of an antitrust exemption, we point out that *if* the Redskins had lobbied with Congress for a specific provision in the Stadium Act stating that in order to secure a long-term lease the stadium would be leased for professional football exclusively to one team, the activities of the Redskins in lobbying for such a provision would have fallen squarely within *Noerr* and *Pennington*, and clearly would have been valid as an exercise of First Amendment rights.

32. 259 F.Supp. 440 (E.D.Pa.1966).

33. *Id.*, at 453.

34. *See generally* S. Oppenheim & G. Weston, Federal Antitrust Laws 160–162 (3d ed. 1968).

perspicacious observers [35] who predicted that the District Court opinion had given unwarranted scope to the *Noerr* doctrine and that ultimately application of the antitrust laws would prevail.

On the precise issue of *Johns Manville* the First Circuit in George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.[36] reached precisely the opposite result. For purposes of the appeal from the District Court summary judgment dismissing the plaintiff's treble damage antitrust complaint, the Court of Appeals assumed that the defendant Paddock had combined with architects and others to write the specifications for pipeless swimming pools bought by public agencies in a way that would exclude competitors. The plaintiff Whitten was in the same business as Paddock, and alleged damages by these acts of Paddock, which were contended to be in violation of the antitrust laws. Paddock defended on the valid governmental action theory of Parker v. Brown and the rationale of *Noerr-Pennington* that under the First Amendment its efforts to influence public officials could not be in violation of the antitrust laws. In a carefully reasoned opinion Judge Coffin and the First Circuit rejected both rationales. In rejecting Parker v. Brown as binding precedent, the First Circuit stressed, "Our reading of *Parker* convinces us that valid government action confers antitrust immunity only when government determines that competition is not the *summum bonum* in a particular field and deliberately attempts to provide an alternate form of public regulation." [37] In rejecting the *Noerr* analysis as applicable, the Court of Appeals said,

> The key to this decision, * * * is the Court's heavy emphasis on the political nature of the railroad's activities and its repeated reference to the "passage or enforcement of laws." The entire thrust of *Noerr* is aimed at

insuring uninhibited access to government policy-makers. * * * By "enforcement of laws" we understand some significant policy determination in the application of a statute, not a technical decision about the best kind of weld to use in a swimming pool gutter.[38]

The First Circuit also rejected *Pennington*, saying:

> The state legislatures, by enacting statutes requiring public bidding, have decreed that government purchases will be made according to strictly economic criteria. Paddock is free to seek legislative change in this basic policy, but until such change is secured, Paddock's dealings with officials who administer the bid statutes should be subject to the same limitations as its dealings with private consumers. * * * We conclude, therefore, that the immunity for efforts to influence public officials in the enforcement of laws does not extend to efforts to sell products to public officials acting under competitive bidding statutes.[39]

In Trucking Unlimited v. California Motor Transport Co.,[40] the Ninth Circuit likewise declined to apply the *Noerr-Pennington* exemption. There trucking firms had united to oppose competitors' requests for certification with the California Public Utilities Commission and the Interstate Commerce Commission. The combine of trucking firms threatened to use its cumulative financial and legal weight to block any action by the regulatory Commission. The Ninth Circuit said:

> The fundamental reason for the *Noerr-Pennington* exception does not apply. It is not the function of the courts to determine whether laws restraining trade will be adopted or, having been adopted, whether they will be enforced; nor is this the function of an administrative agency engaged in adjud-

---

35. *See* Antitrust and Trade Regulation Today 87 (J. Scott ed. 1969).

36. 424 F.2d 25 (1970).

37. *Id.*, at 30.

38. *Id.*, at 32.

39. *Id.*, at 33.

40. 432 F.2d 755.

ication, \* \* \*. It would be pointless to limit the reach of the Sherman Act in order to protect the access of courts and agencies engaged in adjudicative functions to information and opinion relevant to determinations they have no power to make.[41]

The court in *Trucking Unlimited* apparently considered that an adjudicative agency was in a position similar to a governmental agency charged with procurement, as in *Paddock Pool*. In neither case was the governmental agency in a position to make governmental policy, it was obligated to carry out the policy as already made, hence the rationale of *Noerr-Pennington,* guaranteeing access of private parties in combinations which would otherwise be illegal under the antitrust laws to influence such agency simply did not apply.

*Trucking Unlimited* illustrates again that the determination that a state agency and state action are involved "is only the beginning of the inquiry." In this category of joint efforts to secure governmental action we are discussing belongs, of course, Woods Exploration and Producing Co., Inc. v. Aluminum Company of America, *supra*, already analyzed in full.

D. *Federal government regulation of business.*

We have deferred an examination of decisions relating to federal government regulation of business until last for several reasons. Both parties in the case at bar relied most heavily on the decisions involving state action. The Supreme Court decisions in *Parker, Noerr,* and *Pennington* contained over-broad language in regard to the effect of state action on the applicability of the antitrust laws, and, in our opinion, subsequent decisions in lower courts have not always fully taken into account the rationale behind those Supreme Court decisions. On the other hand, the decisions on the applicability of the federal antitrust laws where federal regulation of business is involved have always proceeded on a different basis. As has been observed,

> Each of the regulated industries presents a unique problem when its status under the antitrust laws needs definition or clarification. The Supreme Court has taken the position Congress has the responsibility of deciding the role of competition for each regulated industry. Therefore, each case is decided on the basis of the wording of the particular statute involved. \* \* A detailed study of the legislative history and an assessment of the "pervasiveness" of the "regulatory scheme" set out in the particular statute are earmarks of each of the Court's opinions on the function of antitrust policy in regulated industries.[42]

While the leasing of public stadiums to professional sports teams is not a regulated industry, it should not be forgotten that that Stadium Act and the antitrust laws were both enacted by the same legislative body, *i. e.*, the U. S. Congress. Therefore, there arises a similar problem of determining congressional intent as to the applicability or non-applicability of the antitrust laws, as we frequently have in the case of a federal government regulated industry. And, as mentioned above, some of the cases relied on most heavily by both parties, *e. g.*, Parker v. Brown, have to do with state regulated industries. Therefore, it is clear that the way the Supreme Court and other courts have analyzed the applicability of the antitrust laws in federal regulated industries is highly pertinent to the analysis we make here of the Stadium Act, the applicability of the antitrust laws to that Act, and the action of the Armory Board taken thereunder.

In Silver v. New York Stock Exchange [43] the Court considered "the proper approach to this case, in our view, is

---

41. *Id.*, at 758–759.

42. Antitrust and Trade Regulation Today 241 (J. Scott & Rockefeller ed. 1967).

43. 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed. 2d 389 (1963).

an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted. The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute."[44] The Court therefore held that "the action here taken by the Exchange would clearly be in violation of the Sherman Act unless justified by reference to the purposes of the Securities Exchange Act,"[45] and that such relevant purposes did not require immunizing the Exchange from liability for treble damages.

In United States v. Philadelphia National Bank[46] the Court likewise declined to find that the antitrust laws (§ 7 of the Clayton Act) did not apply, in spite of the broad regulatory powers given the Comptroller of the Currency. This was followed by United States v. First National Bank and Trust Co. of Lexington,[47] in which the Court again held that bank mergers approved by the Comptroller are subject to antitrust laws and may be prohibited by § 1 of the Sherman Act. On the same day in United States v. El Paso Natural Gas Co.[48] the Court similarly held that Federal Power Commission approval of a utility merger does not render non-applicable the antitrust merger provisions of § 7 of the Clayton Act.

However, in the *Panagra case*[49] the Court found that "the Board is empowered to deal with numerous aspects of what are normally thought of as antitrust problems," that the "acts charged in this civil suit as antitrust violations are pre-cise ingredients of the Board's authority,"[50] and thus the complaint should have been dismissed.[51] Like other regulatory agency cases involving the applicability of antitrust laws, the *Panagra* decision was posited squarely on the particular statute under which the Civil Aeronautics Board operates; hence, this contrary result is by no means inconsistent with the Supreme Court's decisions in the other cited cases. As another example, in United States v. Radio Corporation of America[52] the Court held that the Federal Communications Commission had no authority to decide antitrust issues. The Federal Communications Act[53] explicitly makes the antitrust laws applicable to the broadcast industry.

The maritime industry operates under the power of the Federal Maritime Commission specifically to grant exemptions from the antitrust laws. This power is not to be exercised loosely, hence in *Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien (Swedish American Line)*[54] the Court upheld the Commission regulation that shipping "conference restraints which interfere with the policies of antitrust laws will be approved *only* if" the conferences can show that they are "required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act."[55]

From this review of recent regulatory agency cases involving the applicability or non-applicability of the antitrust laws, it clearly emerges that Congress

44. *Id.*, at 357, 83 S.Ct. 1246, 1257.

45. *Id.*, at 364, 83 S.Ct. 1246, 1260.

46. 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed. 2d 915 (1963).

47. 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed. 2d 1 (1964).

48. 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964).

49. Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

50. *Id.*, at 305, 83 S.Ct. 476, 482.

51. The Court construed the antitrust exemption to be only as broad as specified in the statute. "We therefore refuse to hold that there are no antitrust violations left to the Department of Justice to enforce." (At 305, 83 S.Ct. 476, 482.)

52. 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed. 2d 354 (1959).

53. 47 U.S.C. 151 *et seq.*

54. 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed. 2d 1071 (1968).

55. *Id.*, at 243, 88 S.Ct. 1005, 1009. (Emphasis supplied.)

knows how to spell out an exemption from the antitrust law when it wants to do so, *e. g.*, the CAB and the FMC, where the agencies give consideration to antitrust policy [56] but make the initial decisions themselves, and in contrast to proceedings in the Federal Communications Commission, where any action by the FCC is specifically open to antitrust challenge. When the Congress was dealing with football and other sports,[57] it passed a special statute which permits professional sports teams to negotiate for all league members for television rights, and provides that "[t]he antitrust laws * * * shall not apply to any [such] joint agreement * * *." [58] It also reaffirmed the usual applicability of the antitrust laws to any other contract "by, between, or among persons engaging in, conducting, or participating in the organized professional team sports of football, * * *." [59]

### III. *The District of Columbia Stadium Act and the Claimed Non-applicability of the United States Antitrust Laws*

The appellees make as part of their principal argument a claim that the provisions of the District of Columbia Stadium Act exempt the stadium lease from application of the antitrust laws. In support of this they point to the specific language of the Stadium Act and its legislative history.

#### A. *The Statute.*

The D.C. Stadium Act does provide in part:

> In order to carry out the purposes of this subchapter, the Board is authorized *without regard to any other provision of law,* * * *
>
> (1) to determine all questions concerning the use of the stadium * * *
>
> * * * * * *
>
> (8) *to rent or lease* from time to time for any of the purposes of this subchapter, all or any part or parts of the stadium * * * for such periods of time as the Board shall determine * * *.[60]

It is on the language "without regard to any other provision of law" that appellees primarily rest their case that the U.S. antitrust laws do not apply to a lease of the stadium for any purpose, including a lease requiring exclusive use by one professional football team for thirty years.

The appellees do recognize however, that the expression "without regard to any other provision of law" does not confer a limitless exemption. Deposition testimony considered by the trial court in ruling on the summary

---

56. Two recent decisions of our court should be noted, although the issue of the non-applicability of the federal antitrust laws was not directly raised. In Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 420 F.2d 577 (1969), FMC approval of a contract between New York City and the New York Port Authority containing restrictive covenants was challenged. This court remanded the case to the Commission for further proceedings fully exploring the antitrust questions arising from the restraints in the contracts. It may be implied from this ruling that even though the antitrust laws do not invalidate contracts approved by the Federal Maritime Commission, and this contract was between government entities, yet the responsible governmental body, *i. e.*, the FMC, was required to give due consideration to national antitrust policy. In National Aviation Trades Association v. C.A.B., 136 U.S.App.D.C. 367, 420 F.2d 209 (1969), this court had before it an airport management contract between Pan American Airways and the New York Port Authority, somewhat similar to that involved in *Wiggins Airway, supra.* The Federal Aviation Act requires the CAB to weigh the antitrust considerations, and hence this court reviewed the record supporting the Board's findings that the contract would not create a monopoly in violation of the national antitrust policy.

57. Telecasting of Professional Sports Contests Act, 15 U.S.C. § 1291 *et seq.*

58. 15 U.S.C. § 1291 (1961), as amended, 15 U.S.C. § 1291 (1966).

59. 15 U.S.C. § 1294.

60. 2 D.C.Code § 1723. (Emphasis supplied.)

judgment shows that responsible officials of the Armory Board consider that operation of the stadium is subject to all the police, fire, and health regulations in the District of Columbia. Administrative practice is in accord with this interpretation. And counsel for the appellees on oral argument said that of course the Armory Board has no power to lease the stadium for an illegal purpose. Congressional statutes, we are told, and we agree, should not be interpreted so as to lead to absurd or obviously unintended irrational results.

But exemption from the criminal and public safety statutes is not the only result which might be characterized as irrational and therefore not intended. Certainly the strong policies against behavior deemed by Congress criminal or hazardous to public safety militate against any conclusion that in passing subsequent legislation Congress intended to authorize such conduct. Yet other statutes further policies so basic to our social structure that—in the absence of unequivocal exemption therefrom, either by specific statutory language or by a purpose to enforce other policies of equal or greater importance—it would be irrational to imply that Congress intended to authorize the conduct they proscribe. Preeminent among these are the antitrust laws, designed to preserve free enterprise by prohibiting restraints upon free competition.

Under the wording of § 1723 the Board is authorized without regard to any other provision of law to carry out the purposes of the subchapter, which are defined in § 1720 as "to provide * * * a stadium suitable for holding athletic events and other activities and events of a nature requiring such a facility * *." Of particular significance to our analysis is subparagraph (3) of § 1723, which authorizes the Board to acquire property and equipment necessary to carry out these purposes "except that no contract for more than $3,000.00 shall be entered into for the purpose of this paragraph *without competitive bidding.*" (Emphasis supplied.)

This latter language indicates that Congress considered that the exemptive expression relied upon by appellees made it unnecessary *for the Board* to follow any specific competitive bidding regulations in letting ordinary contracts, and so, under this subparagraph, it was necessary to provide for the use of competitive bidding in letting *larger* contracts having a value in excess of $3,000.-00. More than Congress' preoccupation with such regulations, however, this language indicates to us Congress' concern to preserve the competitive spirit in larger contract offerings, even at the expense of its declared goal of permitting the Board to operate the stadium as a private venture.

Consistent with this, it is difficult to understand: first, if Congress intended the phrase "without regard to any other provision of law" to embrace the antitrust laws, *why* it adopted an anti-free competition attitude in regard to the largest and most important contracts—for long-term rental—the Board was authorized to make, while carefully preserving competition by requiring competitive bidding on other contracts over $3,000.-00; second, if Congress did intend to exclude the applicability of the antitrust laws, *why* it did not do so in language as clear and specific as that used to define the applicability of the competitive bidding statute.

There is simply no reference in the Stadium Act (or in its legislative history) to the antitrust laws specifically. We are not cited to any other federal statute with language comparable to that of the Stadium Act which has been construed to rule out the applicability of the antitrust laws.

B. *The legislative history.*

Looking at the legislative history of the Act, we find no support for the argument that Congress intended to place the activities of the Board under § 1723 beyond the pale of the antitrust laws. In fact, the inferences we gather from examining the legislative history point to the opposite conclusion.

A statement made by Senator Bible, the then Chairman of the District of Columbia Committee, when he was reporting to the Senate on an amendment to subparagraph (6) of § 1723, dealing with concessions in the proposed stadium, is relevant:

> The Committee felt that, inasmuch as the stadium is to be in the *nature of a private venture,* it was more desirable that the Board be *vested with the authority to make its own decisions* as to the letting of concessions, without making restrictions on the Armory Board. (Emphasis supplied.) [61]

This bit of legislative history indicates the motivations behind the drafting of the Stadium Act. Though in reality run by the Government, the stadium was to be in the nature of a private venture. It therefore follows that the Committee must have intended the stadium's operator, the Armory Board, to be free from the aegis of those regulations applying to government agencies which would hamper functioning as a private business. These would include competitive bidding and federal procurement regulations, but would not include the antitrust laws, to which private businesses *are* subject; hence, the strong inference that the expression "without regard to any other provision of law" was meant by Congress to refer only to regulations applying to government agencies.

In arguing for the conclusion that Congress did intend the Board's leasing activities to be exempt from the antitrust laws, the appellees stress that it was essential for the construction of the stadium and its subsequent profitable operation (it has not been profitable) that the Armory Board enter into a long-term lease with the Redskins football team, and that Congress knew this. In fact, it is fair to say on the congressional testimony that the stadium would not have been built without a long-term lease from both the Redskins professional football team and the Washington professional baseball team.

This is not to say, however, that the leases could not have been secured without the restrictive covenant giving exclusive rights with respect to any particular form of use, and the appellees concede that there is nothing in the legislative history which mentions the question of whether the Redskins or any other tenant would be given such a restrictive covenant. Whether the Redskins would have signed a thirty-year lease without such a restrictive covenant is entirely speculative, but it is fair to point out that appellants' argument that there is no place in the District of Columbia suitable for professional football other than Kennedy Stadium is uncontradicted, that the Redskins might have been faced with the alternative of having no access at all to Kennedy Stadium unless they did sign a long-term lease, and that the possibility of bringing in another professional football team of a competitive league could not have been excluded.

C. *Comparative importance of the policies behind the Stadium Act and national antitrust policy.*

We think it significant that in those cases where the antitrust laws were held *not* to apply there was a national or state policy of importance approximately equal to the antitrust laws involved. For example, in Parker v. Brown the state action was regulation of an important agricultural product, and a state regulation completely consistent with the federal Agricultural Adjustment Act. In *Noerr* and *Pennington* the constitutional First Amendment rights formed the underpinning of the decision that the actions of the private parties there in soliciting governmental action were not in violation of the antitrust laws. Similarly, in the federal regulatory cases such as *Silver, Philadelphia Bank,* and others discussed above, there was a conscious or implied evaluation of the importance of the national policy reflected in the creation of the regulatory agency compared with that of the federal antitrust laws. The agency's responsibilities,

61. 103 Cong.Rec. 13567 (1957).

the "pervasiveness of the regulatory scheme," the extent to which the agency itself was called upon to pass upon antitrust considerations, and the degree to which it had in fact done so as reflected in the record,[62] were all considered. Since the creation of the regulatory agency and the definition of its responsibilities stemmed from the same source as the antitrust laws, *i. e.*, the U. S. Congress, an effort was made to reconcile the possibly conflicting national policies. In almost every case there is a reiteration of the theme that repeal or immunity or exemption from the federal antitrust laws will not be lightly implied.

We suggest that the action of Congress in providing a public stadium for the District of Columbia, while a governmental act of considerable importance to this particular community, hardly rises to the same dignity or furthers as important policies as the action of Congress in regulating the securities exchanges, the national banks, oil and gas pipelines, aviation or maritime routes, and that if in the consideration of cases arising from those federal regulatory agencies it is necessary for the Supreme Court and other courts to examine the extent to which the antitrust laws apply,[63] it is reasonable to hold here that we must find a definite, clearly expressed, specific intent of Congress to rule out the applicability of the antitrust laws to the acts of the Armory Board before such exemption can be granted.

██ On examination of the statute, the legislative history, the administrative practice, a comparison of the Stadium Act with other federal statutes referring or not referring to antitrust applicability, and the relevant cited cases, we do not find that the applicability of the federal antitrust laws has been excluded. We therefore hold that the validity of

the thirty-year lease between the appellees Armory Board and Pro-Football, Inc., must be tested in accordance with the United States antitrust laws as usually applied to contracts between private parties. For trial on the merits in accordance with this opinion the judgment of the District Court is reversed and the case

Remanded.

---

62. *See, e. g.*, this court's decisions in Marine Space Enclosures, Inc. v. F.M.C., *supra*, and National Aviation Trades Association v. C.A.B., *supra*.

63. As shown by the cited cases, the rule generally is that the antitrust laws *do* apply unless there is a specific exemption, as in the FMC or CAB cases; and, even in those, there must be a showing in the record that the regulatory agency has properly considered the antitrust implications in its decisions.