632 F.2d 680
 1980-2 Trade Cases 63,562
 CHAMPAIGN-URBANA NEWS AGENCY, INC., Plaintiff-Appellant,
v.
J. L. CUMMINS NEWS CO., INC., Martin R. Hoffman, Secretary
of the United States Army, and John L. McLucas,
Secretary of the United States Air
Force, Defendants-Appellees.
 No. 79-2290.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 27, 1980.
Decided Sept. 24, 1980.
As Modified on Denial of Rehearing and Rehearing En Banc
Dec. 10, 1981.*
 
 Alan E. Popkin, St. Louis, Mo., James L. Capel, Jr., Champaign, Ill., for plaintiff-appellant.
 Ralph J. Swanson, Danville, Ill., for defendant-appellee, J.L. Cumins News Co., Inc.
 V. Rock Grundman, Jr., and Charles G. Symmonds, Army & Air Force Exchange Service, Dallas, Tex., for defendants-appellees, Martin R. Hoffman, Secretary of U.S. Army and J.L. McLucas, Secretary of U.S. Air Force.
 Before SWYGERT, Circuit Judge, KILKENNY, Senior Circuit Judge,** and WOOD, Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 We are faced with the resolution of a novel issue potentially having significant impact on the Army and Air Force. The core of the problem is whether or not the Robinson-Patman Amendments to the Clayton Act are applicable to the commercial activities of the Army and Air Force Exchange Service (AAFES).
 
 The Parties
 
 2
 Plaintiff-appellant Champaign-Urbana News Agency, Inc. (CU) is a Delaware corporation in business as a wholesale distributor of paperback books, magazines, and comic books with its principal place of business in Champaign County, Illinois.
 
 
 3
 Defendant-appellee J. L. Cummins News Company, Inc. (Cummins), an Illinois corporation with its principal place of business in Indiana, is a competitor of CU in the wholesale distribution of paperback books, magazines, and comic books in the State of Illinois.
 
 
 4
 Defendants-appellees Martin R. Hoffman and John L. McLucas (Secretaries) are respectively Secretary of the United States Army and Secretary of the United States Air Force.
 
 
 5
 The AAFES is not a party, but will be identified here before beginning an examination of its operations in some detail. It is a joint military command of the Army and Air Force which operates exchanges on Army and Air Force bases in this country and overseas including the exchange directly involved in this case at Chanute Air Force Base (Chanute) in Champaign County, Illinois. An exchange is a retail store for those in or connected with our military forces.[1] Although an exchange may appear to be comparable to the old general store selling everything from toothpaste to motor oil, an exchange actually provides only a limited range of merchandise to a limited group of customers. An exchange is a place on a military installation where military personnel and their families may conveniently purchase many of their needs at less cost than off base.
 
 The Facts
 
 6
 The essential facts are brief and undisputed. Between 1953 and 1975, CU held the AAFES wholesale account at Chanute for books and magazines. In connection with a solicitation for bids for the right to supply Chanute for a year beginning in April 1976, AAFES switched wholesalers and awarded the contract to Cummins. It appears that Cummins underbid CU by offering AAFES a five percent prompt payment discount which it did not offer to any of its other customers.
 
 The Pleadings
 
 7
 The pleadings were considered both by Judge Wise and Judge Baker who came to different conclusions giving rise to the first preliminary issue.
 
 
 8
 CU's complaint filed in 1976 charged in Count I that the prompt payment discount given to AAFES by Cummins constituted price discrimination prohibited by § 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a),[2] to CU's damage in the amount of $30,000. Treble damages and an order enjoining Cummins from continuing its discriminatory pricing practice were sought. Count II sought a declaratory judgment pursuant to 28 U.S.C. § 2201 to determine whether § 2(a) and (c) of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. § 13(a), (c))[3] applied to sales to AAFES.
 
 
 9
 Cummins and the Secretaries filed motions to dismiss claiming the Robinson-Patman Act was not applicable to sales to AAFES on the basis that the government was immune. Judge Wise denied the motions as he was not prepared, he explained, to hold "as a matter of law, that a governmental instrumentality such as AAFES cannot be in functional competition with private interests. The effect on competition, in the instant case, remains to be established by proof at trial."[4]
 
 
 10
 Subsequently, CU amended its complaint and added Count III seeking injunctive relief and damages against the Secretaries for knowingly inducing and accepting from Cummins a discriminatory price in violation of the Robinson-Patman Act. In the meantime, Judge Wise took senior status and Judge Baker assumed responsibility for the case. Cummins and the Secretaries filed new but similar motions attacking the amended complaint. Judge Baker, however, granted defendants' motions and dismissed the amended complaint with prejudice on the basis that Congress had not waived the sovereign immunity enjoyed by AAFES as a part of the government so as to permit the application of the Robinson-Patman Act either to purchases by AAFES or sales to AAFES. 479 F.Supp. 281 (C.D.Ill.1979). This appeal followed.
 
 The Issues
 Three issues evolve:
 
 11
 The first arises from Judge Baker's dismissal of the action which was fundamentally the same action Judge Wise had previously declined to dismiss. We consider whether Judge Baker was precluded by the "law of the case" from coming to a different conclusion than did Judge Wise.
 
 
 12
 The principal issue to be determined, however, is whether or not the Secretaries are immune from suit under the Robinson-Patman Amendments to the Clayton Act for the activities of AAFES.
 
 
 13
 Finally, the related issue is to determine if Cummins as a seller to AAFES is likewise entitled to any immunity that may be found to exist in AAFES.
 
 Law of the Case
 
 14
 Because of the divergent views expressed by Judge Wise and Judge Baker on the principal issue in the same case, we are urged by CU to apply the "law of the case" rule thereby adopting the view of Judge Wise as controlling over the subsequent and contrary view expressed by Judge Baker.
 
 
 15
 The law of the case is not entitled to the same respect as the doctrine of stare decisis. The law of the case does not demand obsequiousness right or wrong. Mr. Justice Holmes said that the phrase "law of the case" merely expressed the practice of courts generally to refuse to reopen what had been decided but was not a limit on their power. Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous. There is no need to await reversal. 1B Moore's Federal Practice P 0.404(1), at 407. To modify the law of the case is primarily a matter of "good sense." Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation of City of New York, 426 F.2d 619, 628 (2d Cir. 1970), motion denied, 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693 (1917), cert. denied, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).
 
 
 16
 There is no suggestion of forum shopping in this case. That would not be sanctioned, but even that would not require us to affirm error. We held in Bowles v. Wilke, 175 F.2d 35, 37 (7th Cir.), cert. denied, 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949), that "(t)he only restraint upon a second judge in passing upon an interlocutory issue decided by another judge in the same case is one of comity only, which in no way infringes upon the power of the second judge to act."
 
 
 17
 There is no need for rigid adherence to the earlier law of the case. Not only did Judge Baker rule early in the proceedings before trial but in any event the issue was one of jurisdiction recognizable at any time. His action did not delay and postpone finality. It accelerated it. There was no abuse of discretion. As this court said in Parmelee Transportation Co. v. Keeshin, 292 F.2d 794, 797 (7th Cir. 1961), "(o)bviously we cannot be expected to reverse a correct decision by one district judge simply because we find it is contrary to a prior ruling by another district judge in the same case, i. e. contrary to the 'law of the case.' " The next issue is the more difficult one, and that is whether Judge Baker's change in law of the case was a change for the better.
 
 AAFES
 
 18
 It is necessary to examine AAFES in more detail, bearing in mind that Judge Baker dismissed plaintiffs' suit against the Secretaries on the ground that they were immune from antitrust liability because AAFES is part of the government.
 
 
 19
 AAFES is a unique and impressive operation although to some it appears to be just another chain of department stores. In 1969 AAFES ranked third behind Sears, Roebuck & Company and J.C. Penney Company with sales that year in excess of $3.5 billion. In 1976 AAFES had over 3,000 retail outlets with over 10,000 other types of facilities including auto repair, customer service, vending facilities, and movie theatres.
 
 
 20
 In some other respects AAFES resembles a private enterprise. For instance, it has civilian employees, uses modern merchandising techniques, keeps its own financial records, pays some of the same taxes as does a private retailer and carries the usual private enterprise insurance protection. But beyond those few similar characteristics the AAFES is unique.
 
 
 21
 First, the AAFES is self supporting as Congress does not and need not appropriate tax dollars to support its operation.
 
 
 22
 The AAFES is likewise uniquely organized as the joint regulation of the Army and Air Force succinctly explains:[5]
 
 
 23
 1-5. Organization. a. The Army and Air Force Exchange Service (AAFES) is a joint command of the US Army and US Air Force under the jurisdiction of the Chief of Staff, US Army and Chief of Staff, US Air Force. AAFES is the entity embracing the activities, personnel, property, and nonappropriated funds through which exchange and motion picture services are provided within the Army and the Air Force.
 
 
 24
 b. The Board of Directors, Army and Air Force Exchange Service (Board of Directors) is responsible to the Secretary of the Army and the Secretary of the Air Force, through the respective Chiefs of Staff, for directing the AAFES. . . .
 
 
 25
 c. The Commander, AAFES is the executive agent for the Board of Directors, for the administration of AAFES.
 
 
 26
 The Board of Directors is itself uniquely constituted as can be seen in a joint regulation:[6]
 
 
 27
 1. Designation. The Board of Directors, Army and Air Force Exchange Service, is a permanent Army and Air Force Board.
 
 
 28
 2. Composition. a. The Board of Directors, Army and Air Force Exchange Service, hereinafter referred to as the Board, will consist of the following voting members:
 
 Comptroller of the Army
 Comptroller of the Air Force
 The Adjutant General of the Army (TAG)
 
 29
 Chairperson, Army and Air Force Exchange Service, Pacific Council
 
 
 30
 Chairperson, Army and Air Force Exchange Service, Europe Council
 
 
 31
 Commander, Army and Air Force Exchange Service
 
 
 32
 One general officer designated by each of the following:
 
 
 33
 Deputy Chief of Staff for Logistics, Department of the Army . . .
 
 
 34
 Deputy Chief of Staff, Personnel, Department of the Air Force . . .
 
 
 35
 Deputy Chief of Staff, Programs and Resources, Department of the Air Force . . .
 
 Sergeant Major of the Army
 Chief Master Sergeant of the Air Force
 
 36
 The purpose of AAFES is also unique compared with private enterprise. Its mission is to "(p)rovide merchandise and services of necessity and convenience which are not furnished from appropriated funds to authorized patrons at uniformly low prices" and to "generate reasonable earnings to supplement appropriated funds for the support of Army and Air Force welfare and recreational programs."[7] In that statement of its purposes are a number of aspects which must be separately considered so as to better understand what it is that the plaintiff seeks to bring within the ambit of the antitrust laws.
 
 
 37
 AAFES prices are purposely uniformly low. The policy is not to charge all the traffic will bear, but primarily to provide service to United States military personnel and their dependents throughout the world. The AAFES is charged with providing service whether it can be justified economically or not. The House Armed Services Committee, however, limits the categories of goods and services provided, establishes cost price limits and controls who the customers of AAFES may be. In order to fulfill its mission, to provide merchandise and services at a low price, AAFES must, therefore, attempt to procure those goods and services at the lowest possible prices. That is the root of the present controversy.
 
 
 38
 The AAFES is also unique because it is required to be selective about its customers. Exchange privileges are controlled. In addition to active duty uniformed personnel, certain others are permitted to be customers, for instance, retired personnel, honorably discharged disabled veterans, certain members of reserve components, and recipients of the Medal of Honor, our highest decoration for valour, and their dependents. Limited privileges are also given to the employees of the exchanges and other government civilian employees residing on a military installation for the convenience of the government. There is a special type of privilege extended also, for instance, to ROTC cadets if under orders and occupying quarters on a military installation. That should be sufficient review to give an idea of AAFES customer limitations.[8]
 
 
 39
 Another feature distinguishing AAFES from an ordinary commercial enterprise is the disposition of its profits and dividends. Individual stockholders of an ordinary business corporation expect to profit when business is good, but in the case of AAFES the "stockholders" are all the members of our military forces. The dividends go to the respective Army and Air Force Central Welfare Funds and then down command channels to individual military units. The AAFES dividends are matched with other funds appropriated by Congress to support morale, welfare and recreation programs. Those activities include sports programs, hobby shops, child care centers, dependent youth centers, etc., for military personnel.
 
 
 40
 Congress has kept a particularly close eye on AAFES activities. The nature and extent of congressional interest and congressional characterization of AAFES is apparent from numerous congressional reports. We will sample only a few which are important enough to set out at some length:
 
 
 41
 The exchanges are self-supporting. They pay their way. They pay Federal taxes. The only beneficiaries are the enlisted men and women for whom recreational facilities are purchased with the profits of the exchange systems. If this were not so, the American taxpayer would be directly charged with the cost of providing these recreational facilities, such as libraries and athletic equipment and entertainment, which are indispensable to the morale of the service men and women.
 
 
 42
 The reason for the existence of the exchanges is necessity.
 
 
 43
 The post exchange is the enlisted man and woman's club. Many times it is the only thing that stands between them and almost complete stagnation. Service men and women (over 3 million of them at the present time) are shifted from place to place as the needs of training and deployment for military advantage require. They are captives of the Government as to place and duty during the periods of their service. They have no opportunity to integrate themselves with the local communities. They have no way of determining the integrity of the businessman at their gates or in cities nearby military establishments. The same Government that provides medical care and is charged with protecting his morals, owes the further duty of assuring him that he will not be mulcted of his small pay by many unscrupulous characters who, in the past, have preyed upon them.[9]
 
 Here is a later report:
 
 44
 From their earliest organization exchanges have generated "profits" to be used for the welfare and recreation of service personnel. In addition to providing goods at reduced prices to service personnel, the exchanges in fiscal 1970 contributed approximately $131 million for service welfare and recreation programs.
 
 
 45
 The Consolidated Procurement Program was initiated by AAFES in 1967.Savings in excess of $25 million are reported to have been realized during the program's existence, the greatest portion of which have been passed on to the customer in the form of reduced prices. The program has enabled AAFES to capitalize on its aggregate purchasing needs in a manner which has benefited its customers and stabilized its relations with suppliers. The benefits of AAFES consolidated procurement negotiations in terms of contract prices, terms, and conditions are available to the Navy, Marine, and Coast Guard exchange systems.
 
 
 46
 At the same time, the subcommittee reiterates its support in the face of rising living costs of soundly conceived and administered programs to enhance the purchasing power of military pay.
 
 
 47
 The subcommittee concluded its comprehensive review of the exchange and commissary system firm in the belief that these vital benefits should be maintained for the morale and convenience of our service personnel.[10]
 
 
 48
 And finally here is an excerpt from a more recent report:
 
 
 49
 Nonappropriated fund activities of the Department of Defense occupy a unique position. They render a service vital to the morale of military personnel and their dependents. Nonappropriated funds are instrumentalities of the Federal Government and are entitled to the sovereign immunities and privileges of the United States as provided in the Constitution, statutes, treaties, and agreements with foreign governments. They also experience tangible benefits, such as tax relief.
 
 
 50
 Nonappropriated funds are basically grouped under three categories, revenue-producing, welfare, and sundry. Revenue-producing funds are established primarily to administer the sale of merchandise and services to Armed Forces personnel and their dependents, and secondarily to generate a net financial return which is used for the collective benefit of the personnel serviced. Funds generated in this manner are primarily distributed to welfare funds. Included under the heading of revenue-producers are exchanges and motion picture theatres, principal sources of income to the welfare funds.
 
 
 51
 AAFES in fiscal year 1972 contributed dividends in the amount of $82,457,000. The Army Central Welfare Fund received $52,538,000 and the Air Force Central Welfare Fund received $29,918,000.
 
 
 52
 The exchanges have traditionally and continually been vigilant in getting the lowest price possible from manufacturers.
 
 
 53
 The subcommittee is convinced that in addition to pay, these vast retail systems and the welfare and recreational activities they help supplement, are the most important benefits accruing to the servicemen. Further, that these benefits are a prime incentive for servicemen to follow a military career. Service personnel not only expect these benefits, but have placed a reliance on them that cannot be easily denied.
 
 
 54
 The responsibility of ensuring that these benefits receive the highest priority lies not only within the Department of Defense but also with the Congress. . . .[11]
 
 
 55
 We have sought to generally display the nature and purpose of AAFES and its exchanges. No one who has served in our armed forces need be told what an integral part AAFES plays in military life.
 
 Immunity of the Secretaries from Suit
 
 56
 This is a case of first impression but we must begin with certain fundamentals. It is well established that the United States cannot be sued without its specific statutory consent and that no government officer by his action can confer jurisdiction otherwise lacking. United States v. Shaw, 309 U.S. 495, 500-01, 60 S.Ct. 659, 661, 84 L.Ed. 888 (1940). Nor will a waiver of traditional sovereign immunity be implied. It must be unequivocally expressed. United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Even were we to determine that immunity from antitrust liability was not sound policy, which we do not, this court would lack the power to substitute its judgment and change the policy even though express statutory exemption is lacking. United States v. N.Y. Rayon Importing Co., Inc., 329 U.S. 654, 663, 67 S.Ct. 601, 605, 91 L.Ed. 577 (1947). There is no question but that there exists no statute granting consent to sue the United States for alleged antitrust violations. That being so, no waiver or implication will suffice. But, argues CU, sovereign immunity protects only the sovereign, whereas AAFES instead is "in reality a business enterprise," not a branch of the United States government and therefore not entitled to be shielded from the antitrust laws. CU further argues that there is no immunity to be extended to the Secretaries in their representative capacities as the overseers of AAFES. In summary, it is CU's position that antitrust immunity is not conferred upon a government instrumentality merely by virtue of its status as such and that when a government agency or instrumentality performs commercial and proprietary functions in a manner contrary to public policy as codified in federal law and in regulations governing its conduct, it is not sheltered from the antitrust laws.
 
 
 57
 CU spotlights the fact that the Secretaries argue that the Army and Air Force regulations require AAFES to purchase at the lowest prices for resale, but on the other hand, AAFES in order to obtain the lowest price ignores other contradictory provisions in its regulations directing AAFES adherence to antitrust laws.
 
 
 58
 The AAFES Manual "Exchange Service Procurement Instructions" provides:
 
 
 59
 Unless proposals are generally competitive, contract prices tend to be higher or fees lower than they should be. If an AAFES contracting officer considers that any proposal received is designed to eliminate competition, he is required to report such a proposal. . . . Practices that tend to eliminate competition or restrain trade and that may evidence violation of antitrust laws include but are not limited to collusive proposals, follow-the-leader pricing, rotated low offers, identical proposals and sharing of the business. . . . The report should set forth: (1) The noncompetitive pattern or situation . . .; (2) Procurement experience in the same product or service for . . . one or more years . . . prior to the receipt of the proposal under consideration, including unit and total contract price. . . .
 
 
 60
 CU also directs our attention to the partial text of a regulation effective in 1977 but which has since been removed from the Code of Federal Regulations. The text CU cites provides: "Exchange procurement will be conducted on the basis of full and free competition to the maximum extent practicable, . . ." 32 C.F.R. § 554(b) (1977). CU neglects to indicate that the rest of the regulation provides "and consistent with the immunity of exchanges from State regulations and control, award will be made to the responsive and responsible contractor whose offer is most advantageous to the exchange, price and other factors considered." The additional text suggests that any self-imposed duty to obey the antitrust laws is qualified.
 
 
 61
 The Secretaries, however, fail to directly explain the apparent contradiction. The question is can AAFES seek to obtain the "lowest price possible" by accepting a lower price than the buyer offers to its other comparable customers even though it might constitute a violation of the antitrust laws and of the regulations requiring compliance.
 
 
 62
 The removed AAFES regulations and existent guidelines refer to no particular antitrust act. Mentioned as examples of undesirable antitrust activity are collusive proposals, follow-the-leader pricing, rotated low offers, identical proposals and sharing of business. There is no mention of the receipt by AAFES of a beneficial discount from a buyer who does not accord the same discount to other buyers similarly situated. It appears that AAFES may be seeking to have it both ways by benefiting from antitrust restrictions which would tend to reduce its costs, but ignoring antitrust restrictions which tend to increase its costs.
 
 
 63
 The antitrust laws themselves are not in perfect harmony. In Standard Oil Co. v. FTC, 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951), the Court commented that it "need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts." That reconciliation remains incomplete. Great Atlantic & Pacific Tea Co. v. FTC, 440 U.S. 69, 83 n.16, 99 S.Ct. 925, 934 n.16 (1979). It is an anomaly, at least, to say that there is no reason why AAFES cannot have it both ways. In any event, if AAFES enjoys immunity from the antitrust acts it cannot voluntarily choose as a matter of its own internal policy to subject itself to antitrust liability. Voluntarily taking advantage of some antitrust restrictions and avoiding others is not the same as voluntarily attempting to waive governmental immunity for antitrust violations. If AAFES is immune as part of the executive branch of government, it cannot waive its governmental immunity. American Foreign Steamship Corp. v. United States, 291 F.2d 598, 607 (2d Cir.), cert. denied, 368 U.S. 895, 82 S.Ct. 171, 7 L.Ed.2d 92 (1961). Only Congress can create a right of suit against it and Congress has not specifically made AAFES subject to the antitrust laws. Congress has considered doing so, but has not.
 
 
 64
 There is strong evidence in the legislative history that the Robinson-Patman Act Amendments were not intended to include purchases by the federal government. In a statement by the principal draftsman of the amendments to the House Committee on the Judiciary it said that the bill would not prevent competitive bidding on government purchases below trade price levels.[12] The year following passage of the amendments the Attorney General in a letter to the Secretary of War expressed the view that the Act as amended did not apply to federal government purchases as the statute did not expressly so provide.[13] Congressman Patman in his book published in 1938 acquiesced in the view taken by the Attorney General.[14] The question has not been neglected in Congress since that time. Bills were introduced for example in 1951, 1955, and 1957. Congressman Patman sponsored the 1951 bill. The bills would have brought the government within the provisions of the Robinson-Patman Act to make the Act applicable to sales to governmental agencies for resale. The comments of various government officers on that legislation are of interest. Attorney General Rogers interpreted the 1955 bill as being aimed primarily at exchanges and similar sales but as a matter of policy took no position on the bill. Of particular interest is a letter from the Administrator of the Small Business Administration opposing enactment of the 1955 bill noting among other things that the exchanges were created to improve the morale of service personnel. As might be expected, the Secretary of the Air Force strongly opposed enactment. His 1956 letter to the Chairman of the House Judiciary Committee put the issue squarely to the Congress and deserves to be set forth:The mission of Post Exchanges is to perform a government function on military installations of supplying a strictly limited group of authorized persons with needed retail facilities at lowest possible cost.
 
 
 65
 The place that Post Exchanges fill in the life of the military personnel was recognized by the Special Subcommittee of the Committee on Armed Services, House of Representatives, in its Report of Investigation in 1949, when it stated that the justification for maintenance and operation of exchanges was: "To provide a convenient and attractive source of items of convenience and comfort and thereby maintain a spirit of community life and high morale." (Report No. 115, p. 4001.)
 
 
 66
 Since exchanges are not intended to, and do not, in fact, substantially compete with private business, extension to them of the restrictions and controls in the Robinson-Patman Act would be discriminatory. It would increase the cost of merchandise to exchanges and require them to raise their prices to service personnel.
 
 
 67
 This Department believes the application of H.R. 5213 upon the sales made by the Post Exchanges to military personnel could have substantial impact upon the profits of the exchange system which provide the funds used to purchase recreational facilities for the sole benefit of enlisted men and women. Although the application of H.R. 5213 upon the sales made by commissaries and Quartermaster sales' stores would have no effect upon profits, since commissary and quartermaster supplies are not sold for profit, its effect upon costs would necessarily be reflected in higher prices to military personnel. This Department is opposed to any legislation which would have the effect of further whittling away, directly or indirectly, those things which attract and keep servicemen and servicewomen in the service.
 
 
 68
 It is the opinion of this Department that, should this bill be enacted, the military services and their personnel may be subjected as having knowingly received a discrimination in price (sec. 2(f), Clayton Act, as amended), to the harassment and expense of defending suits thereunder. Such suits may be brought by any person who believes himself entitled to the treble damages provided by that Act (sec. 4), although such demand may be unfounded.
 
 
 69
 In 1957 the Secretary of Commerce, writing the House Judiciary Committee, opposed similar legislation, took note of the convenience and morale factors for military personnel, and added:
 
 
 70
 Since the basic purpose of the Robinson-Patman Act is to eliminate unfair competition among those engaged in private enterprise where such practices might result in restraint of trade or injury of competition, the inclusion of the Federal Government under this Act is inappropriate and would fail to recognize the difference between the mutual obligations of business and the sovereign rights of the Federal Government.
 
 
 71
 In 1959, similar legislation was opposed by the Federal Trade Commission. Thus it can be seen that even those federal agencies concerned with the welfare of the private business enterprise, Small Business Administration, Department of Commerce and the Federal Trade Commission opposed having the Congress do what CU asks this court to do.
 
 
 72
 It is clearly apparent from those congressional activities that the Congress and the Executive Branch have always considered that exchanges were not subject to the antitrust laws, have considered whether they should or should not be, and have continued to let exchanges retain and enjoy their antitrust immunity. The bills all failed to pass and the Act remains unamended. In view of that history of consideration of the antitrust issue by both the other branches of government this court should be very hesitant to now rule otherwise unless it is clear that Congress has misinterpreted its own existing legislation.
 
 
 73
 CU, nevertheless, directs us to cases which it argues should persuade us to squarely hold that AAFES has no antitrust immunity. It was, however, first necessary for CU to try to avoid the broad language of Standard Oil Co. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). At issue in that case was the validity of a California statute imposing a fuel license tax on persons who distributed fuel to post exchanges. In writing for a unanimous court Mr. Justice Black reviewed the formation and development of exchanges:
 
 
 74
 On July 25, 1895, the Secretary of War, under authority of Congressional enactments promulgated regulations providing for the establishment of post exchanges. These regulations have since been amended from time to time and the exchange has become a regular feature of Army posts. That the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law.
 
 
 75
 Congressional recognition that the activities of post exchanges are governmental has been frequent. Since 1903, Congress has repeatedly made substantial appropriations to be expended under the direction of the Secretary of War for construction, equipment, and maintenance of suitable buildings for post exchanges. In 1933 and 1934, Congress ordered certain moneys derived from disbanded exchanges to be handed over to the Federal Treasury. And in 1936, Congress gave consent to state taxation of gasoline sold by or through post exchanges, when the gasoline was not for the exclusive use of the United States.
 
 
 76
 The commanding officer of an Army Post, subject to the regulations and the commands of his own superior officers, has complete authority to establish and maintain an exchange. He details a post exchange officer to manage its affairs. This officer and the commanding officers of the various company units make up a council which supervises exchange activities. None of these officers receives any compensation other than his regular salary. The object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. Soldiers, their families, and civilians employed on military posts here and abroad can buy at exchanges. The Government assumes none of the financial obligations of the exchange. But government officers, under government regulations, handle and are responsible for all funds of the exchange which are obtained from the companies or detachments composing its membership. Profits, if any, do not go to individuals. They are used to improve the soldiers' mess, to provide various types of recreation, and in general to add to the pleasure and comfort of the troops. (Footnotes omitted.)
 
 
 77
 Id. at 483-85, 62 S.Ct. at 1169-70.
 
 The Court then resolved the issue:
 
 78
 From all of this, we conclude that post exchanges as now operated are arms of the Government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the Constitution and federal statutes. In concluding otherwise, the Supreme Court of California was in error.
 
 
 79
 Id. at 485, 62 S.Ct. at 1170.
 
 
 80
 CU correctly points out that Johnson did not involve an antitrust issue, and argues that the case does not stand for the proposition that AAFES performs governmental as opposed to proprietary functions in connection with its retail store operations. Johnson, however, laid a broad, solid foundation.
 
 
 81
 We will briefly review some of the cases relied upon by CU. CU finds some support for its view in Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), again involving California. California was attempting to enforce its milk wholesale price regulations with respect to milk sold to the United States at military installations, including milk for resale at exchanges. The significance of the case lies in a distinction the majority made between purchases of milk with appropriated funds and purchases of milk from nonappropriated funds for resale at exchanges. The Court held that milk purchases from nonappropriated funds may under some circumstances be subject to state regulations, but not purchases from appropriated funds. The circumstances, however, that may subject the exchange milk purchases to state regulations does not turn merely on whether nonappropriated funds are used or not, but on how the United States acquired from the state the particular tract of land upon which the federal military installation rests which houses the exchanges. We need not examine the Paul issue since there is no related question in the present case. There is in Paul no issue of the application of the antitrust laws to exchanges. Paul therefore has the same deficiency which CU found with Johnson. Paul does not erode the broad foundation laid by Johnson.
 
 
 82
 CU also relies on a line of cases we find to be so distinguishable as to be of little influence on the present case. It is argued that the cited cases stand for the proposition that a government instrumentality performing proprietary functions is not ipso facto immune from antitrust laws. We agree, but the cited cases involved governmental bodies other than the federal government and different issues. We will examine a sample of those cases.
 
 
 83
 City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), holds that there is no implied exclusion of cities as municipal utility operators from the antitrust laws. The application of the "state action" doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), considered in City of Lafayette has no application to the present case. In Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the question was whether a minimum fee schedule adopted by a County Bar Association and enforced by the State Bar violated the Sherman Act. The State Bar claimed exemption as an agency of the Virginia Supreme Court. The United States Supreme Court found that the Virginia Supreme Court had taken no action requiring the use of minimum schedules so that there was no state action. Any analogy to the present case is not productive. Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), called into question the distribution of free light bulbs by a regulated private utility. The case similarly turned on the absence of state authorization for the light bulb program. Our decision in Kurek v. Pleasure Driveway and Park District of Peoria, 557 F.2d 580 (7th Cir. 1977), vacated and remanded, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), reconsidered and aff'd as to antitrust issues, 583 F.2d 378 (7th Cir. 1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979), considered an antitrust controversy between competing municipal park concessionaires and the municipal park district. We held that the park district was merely a subordinate unit of government not entitled to all the deference accorded the state itself and that the mere finding of involvement by some governmental unit did not end any antitrust inquiry. Our holding in the present case does not depart from our holding in Kurek. The decision in Hecht v. Pro-Football, Inc., 444 F.2d 931 (D.C.Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), is distinguishable because it involved a Washington, D. C. armory board created by Congress. An exclusive lease of the Robert F. Kennedy Stadium had been granted to the Washington Redskins football team. The court held that the armory board, created to run a commercial operation, was subject to the antitrust laws saying that neither "the Board nor the Redskins in this case are performing a function that a purely governmental agency itself could have performed." Id. at 939. The factual circumstances in Hecht are too remote from the present case for it to be controlling.
 
 
 84
 CU argues generally that antitrust immunity is disfavored even when federal instrumentalities are involved. Again the cases cited in support of that argument are so distinguishable from the present case as to be of little influence. Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. First National Bank & Trust Company of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); and United States v. El Paso National Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), are all cases involving industries subject to federal regulatory commissions. Those cases raise different issues.
 
 
 85
 CU advances a further argument to the effect that various congressional enactments have shown an awareness by Congress that AAFES is not synonymous with government. Special provisions have been made, for instance, for civilian employees of nonappropriated fund instrumentalities disabled in the course of employment.[15] Congress has also permitted states to tax gasoline sold at exchanges,[16] exempted AAFES from coverage under the Armed Service Procurement Act,[17] required AAFES, not the United States, to pay any damages which may be found to have arisen out of its contracts,[18] and has also provided that no money appropriated by Congress for the Army and Air Force shall be spent for exchanges.[19] We interpret those congressional enactments otherwise than does CU. They demonstrate to us that when the Congress desires to modify the usual rule or to make special provision applicable to AAFES operations it knows how to do it. Whenever a bill was introduced, however, to provide for antitrust liability for AAFES, those bills failed even to be referred out of committee. It is a distorted analysis for CU to argue that Congress "itself" has never addressed the military exchange anti-trust issue present in this case simply because the bills died aborning in committee.
 
 Conclusion
 
 86
 After consideration of its purposes and operations, we conclude that AAFES is a governmental instrumentality entitled to immunity from the Robinson-Patman Amendments to the Clayton Act. If it is thought it should be otherwise, then application for change should be made to Congress and not to us.
 
 
 87
 AAFES is obviously not just a big cut rate store operated by the government to make life difficult for civilian merchants. To try to separate AAFES from our military forces is to wholly ignore all its unique features distinguishing it from private enterprise and to ignore the long established views of both the Congress and the Executive Branch. We should not decide this case on the basis of a mere glance through the front window of an exchange and thereby come to the conclusion that since it looks like any ordinary store it must be one. AAFES is a very important and integral part of our military structure providing a much needed service to military personnel around the world. Fortunately, Congress does not have to support AAFES with tax monies, but AAFES profits are used to supplement tax monies which are appropriated for morale purposes for the armed forces. No one can seriously argue that our fighting forces are not government. The morale of the armed forces is at least as important to their effectiveness as is close order drill, a strictly military discipline. All wholesalers are free to compete for AAFES business according to the same rules. The marketplace is, in a way, made more competitive, not less. Any perceived sacrifice of greater profits by any private business in dealing with AAFES scarcely matches even the peace time sacrifices of members of our armed forces. As we are not "robed legislators" any change in the status of exchanges should be left to the Congress.[20]
 
 Liability of Cummins The Successful Bidder
 
 88
 If the Secretaries have no antitrust liability neither does Cummins. To hold otherwise would only permit collateral attack upon our holding of governmental immunity for the Secretaries. If a particular purchase is exempt from liability under the antitrust laws, both the seller and purchaser in the transaction are exempt. Logan Lanes, Inc. v. Brunswick Corporation, 378 F.2d 212 (9th Cir.), cert. denied, 389 U.S. 898, 88 S.Ct. 219, 19 L.Ed.2d 216 (1967).
 
 
 89
 Affirmed.
 
 
 90
 SWYGERT, Circuit Judge, dissenting in part.
 
 
 91
 Although I recognize that AAFES is an instrumentality of the United States, I do not agree that the second trial judge was correct to conclude that AAFES enjoys sovereign immunity from prosecution under the antitrust laws. It is agreed that there are no cases which have addressed the issue of immunity from the antitrust laws for post exchanges, which as part of the Department of Defense are instrumentalities of the federal government. There are, however, cases dealing with the antitrust laws in relation to instrumentalities of both state government and the District of Columbia, and there are also cases which have confronted the issue of immunity for post exchanges in other than the antitrust context. Both lines of cases require, in my view, a result different from that reached by the majority.
 
 
 92
 In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that California, whose agricultural proration program arguably violated the antitrust laws, was immune from liability because the antitrust laws were not intended to "restrain state action or official action directed by a state." 317 U.S. at 351, 63 S.Ct. at 313. Despite that holding, the progeny of Parker v. Brown have made it clear that "it is not every governmental act that points a path to an antitrust shelter." Woods Exploration & Pro. Co. v. Aluminum Co. of Amer., 438 F.2d 1286, 1294 (5th Cir. 1971). See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).
 
 
 93
 In City of Lafayette v. Louisiana Power & Light Co., the Supreme Court refused to find immunity from antitrust liability for a city which owned and operated an electric utility system, although the city was an instrumentality of the State. Because the city was performing a business rather than a governmental function, the Court found the contention that its goal was not private profit but public service to be "only partly correct. Every business enterprise, public or private, operates its business in furtherance of its own goals" and with "impact . . . on other individuals and business enterprises with which they inter-relate as purchasers, suppliers, and sometimes . . . as competitors." 435 U.S. at 403, 98 S.Ct. at 1132. The Court concluded that the city's business enterprise was not exempt under Parker because it was neither anticompetitive conduct engaged in as an act of government by the State as sovereign, nor an act of a subdivision of the State pursuant to a definite state policy to displace competition with regulation or monopoly public service.
 
 
 94
 There is much similarity between our case and City of Lafayette. AAFES, like the city, is an instrumentality of the Government but is not itself the sovereign. And, like the city, AAFES is engaged in an enterprise which is proprietary rather than governmental. AAFES operates a highly profitable retail chain store in which the Government has no financial interest. Its patrons include a great many civilians and even private organizations. Its suppliers are private concerns. That AAFES' operation, like the city's, impacts on other individuals and business enterprises must be obvious from the fact that in 1969 AAFES ranked third behind Sears, Roebuck & Company and J.C. Penney Company with sales in excess of $3.5 billion.[1]
 
 
 95
 Ours is not the kind of case discussed in City of Lafayette where a subdivision of the Government was violating the antitrust laws pursuant to a government policy to displace competition with regulation or monopoly public service. AAFES' own manual, "Exchange Service Procurement Instructions," emphasizes compliance with the antitrust laws and requires an AAFES contracting officer who receives a proposal designed to eliminate competition to report that proposal to his superiors. For the information of those contracting officers, the manual goes on to list examples of "practices that tend to eliminate competition or restrain trade and that may evidence violation of antitrust laws."[2] Unlike the majority, I do not read the regulations to require AAFES to contract at the lowest price regardless of the impact on competition. That reading results in the inconsistency which the majority strains to explain. The more logical interpretation is that the regulations require lowest price contracting consistent with the antitrust laws. In Penn Dairies v. Milk Control Comm'n, 318 U.S. 261, 275, 63 S.Ct. 617, 623, 87 L.Ed. 748 (1943) the Supreme Court stated that although the Government was required to contract with the lowest responsible bidder, immunity from state regulation would not be inferred "in the absence of some evidence of an inflexible Congressional policy requiring Government contracts to be awarded on the lowest bid despite noncompliance with state regulations otherwise applicable."
 
 
 96
 Although City of Lafayette involved a state rather than a federal entity, the same rationale has been applied to a creation of the United States Congress. In Hecht v. Pro-Football, Inc., 444 F.2d 931 (D.C.Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the issue was whether a District of Columbia armory board, created by an act of Congress to develop and administer a stadium for athletic events, was immune from the antitrust laws. The District of Columbia Circuit analyzed cases involving both state and federal governmental action and concluded that although no antitrust statute could restrict the United States Government in directing action in complete contradiction to antitrust policy, to hold that any valid governmental action is immune "is a much too talismanic approach where scrupulous distinctions are called for." 444 F.2d at 934. Despite language in the federal statute authorizing the armory board to act "without regard to any other provision of law," the court determined that Congress did not intend to exempt the stadium enterprise from compliance with the antitrust laws because it was "in the nature of a private venture." 444 F.2d at 946. In addition, the requirement that certain contracts not be entered into without competitive bidding was evidence that the board was not to operate in disregard of the antitrust laws. AAFES' retail operations are also in the nature of a private venture, and its own manual requires compliance with the antitrust laws.
 
 
 97
 Before today no court had decided whether a post exchange's retail operations were immune from the antitrust laws, but the Supreme Court had determined that post exchanges do not enjoy blanket sovereign immunity. At issue in Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) was whether California could enforce its minimum wholesale price regulations with respect to milk sold at military installations in the state. The Court held that milk used for strictly military consumption or for resale at commissaries, which was purchased with appropriated funds, was immune from state regulation, but that milk for resale at post exchanges, which was purchased with nonappropriated funds, was not immune. The Court found "no conflicting federal policy concerning (post exchange) purchases and sales from nonappropriated funds . . . ." 371 U.S. at 269, 83 S.Ct. at 440. The majority tries to distinguish Paul by noting that it was an issue of state versus federal jurisdiction that was ultimately dispositive, namely, whether the state regulation was in effect when the United States acquired the particular tracts of land involved. That issue (which was remanded to the district court) is not relevant in our case, which does not involve state law. But highly relevant to the facts before us is the issue that was decided by the Court-that no federal policy immunized a post exchange in its retail operations from compliance with state economic regulations.
 
 
 98
 In light of the Supreme Court's holding in Paul that as a matter of federal policy, post exchanges, which operate with nonappropriated funds, are not immune from state economic regulation, it is indeed anomalous for this court to hold that post exchanges, operating as always with nonappropriated funds, are immune from federal economic regulations.[3] The antitrust laws, in particular,
 
 
 99
 further policies so basic to our social structure that-in the absence of unequivocal exemption therefrom, either by specific statutory language or by a purpose to enforce other policies of equal or greater importance-it (is) irrational to imply that Congress intended to authorize the conduct they proscribe.
 
 
 100
 Hecht v. Pro-Football, Inc., 444 F.2d at 945.
 
 
 101
 I would hold that AAFES does not enjoy immunity from antitrust liability. Accordingly, I would reverse and remand this case for trial.
 
 
 
 *
 Swygert, Circuit Judge, dissenting
 
 
 **
 Kilkenny, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation
 
 
 [1]
 In the Army exchanges are referred to as Post Exchanges and in the Air Force as Base Exchanges
 
 
 [2]
 15 U.S.C. § 13(a) provides:
 (a) Price; selection of customers
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: And provided further, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.
 
 
 [3]
 15 U.S.C. § 13(c) provides:
 (c) Payment or acceptance of commission, brokerage or other compensation
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.
 
 
 [4]
 This court on November 2, 1977 denied permission to appeal the order of Judge Wise under 28 U.S.C. § 1292(b)
 
 
 [5]
 Chapter 1, AR 60-10/AFR 147-7 (1978)
 
 
 [6]
 AR 15-110/AFR 20-38 (1977)
 
 
 [7]
 Chapter 1, AR 60-10/AFR 147-7, 1-2 a. and c. (1978)
 
 
 [8]
 The numerous classifications are set forth in section II, AR 60-20/AFR 147-14 (1978)
 
 
 [9]
 From pages 8 and 9, REPORT ON ARMED SERVICES EXCHANGES (PXs), 1953, REPORT OF THE SUBCOMMITTEE ON DEFENSE ACTIVITIES OF THE COMMITTEE ON ARMED SERVICES, UNITED STATES HOUSE OF REPRESENTATIVES UNDER AUTHORITY OF H.Res. 125 (83d Congress) (1953) (reproduced in Appendix of the federal appellees at 26)
 
 
 [10]
 From pages 12343, 12360, 12361 and 12380, REPORT BY THE SPECIAL SUBCOMMITTEE ON EXCHANGES AND COMMISSARIES OF THE COMMITTEE ON ARMED SERVICES, HOUSE OF REPRESENTATIVES, NINETY-FIRST CONGRESS, SECOND SESSION, DECEMBER 22, 1970 (reproduced in Appendix of the federal appellees at 27)
 
 
 [11]
 From pages 16615, 16616, 16641, and 16649, REVIEW OF NONAPPROPRIATED FUND AND OTHER RESALE ACTIVITIES WITHIN THE DEPARTMENT OF DEFENSE; REPORT by the SPECIAL SUBCOMMITTEE ON NONAPPROPRIATED FUND ACTIVITIES WITHIN THE DEPARTMENT OF DEFENSE of the COMMITTEE ON ARMED SERVICES, HOUSE OF REPRESENTATIVES, NINETY-SECOND CONGRESS, Second Session, October 30, 1972 (reproduced in Appendix of the federal appellees at 28)
 
 
 [12]
 Hearing Before the House Committee of the Judiciary on Bill to Amend the Clayton Act, 74th Cong., 1st Sess. 250 (1935)
 
 
 [13]
 38 Op.Att'y Gen. 539-41 (1936)
 
 
 [14]
 W. Patman, The Robinson-Patman Act: What You Can And Cannot Do Under This Law 168 (1938)
 
 
 [15]
 5 U.S.C. § 8171
 
 
 [16]
 4 U.S.C. §§ 104-110
 
 
 [17]
 41 U.S.C. § 252
 
 
 [18]
 31 U.S.C. § 724a
 
 
 [19]
 10 U.S.C. §§ 4779(c) and 9779(c)
 
 
 [20]
 The term "robed legislators" is borrowed from Monaghan, Constitutional Adjudication: The Why and When, 82 Yale L.J. 1363 n.3 (1973)
 
 
 [1]
 There is no suggestion that its impact has lessened since that time. See majority opinion at 683
 
 
 [2]
 That the receipt of a beneficial discount not offered to other buyers is not among the examples given is of no moment, given the Manual's explicit statement that possible antitrust violations "include but are not limited to" those listed
 
 
 [3]
 It is worth noting that any recovery by CU would not impinge on the federal treasury